## P. Bannon Pipe Line Company v. Battle's Administrator.

(Decided February 11, 1919.)

### Appeal from Jefferson Circuit Court (Common Pleas Branch, First Division).

1. Negligence—Contributory Negligence.—Contributory negligence does not bar a recovery, unless, but for the contributory negligence, the injury would not have been incurred.

2. Negligence—Contributory Negligence.—Contributory negligence does not bar a recovery, if the party, perpetrating the injury, was under a duty to exercise care and could have, by the exercise of ordinary care, averted the consequences of the injured one's negligence.

3.  Master and Servant—Care to be Exercised for Safety of Another.—
    Where a duty rests upon one to exercise care for the safety of
    another, and although slight injury may be unavoidable, the duty
    is encumbent upon him, not to inflict any greater injury, than is
    unavoidable, although the injured one, himself, may have been
    negligent.

4.  Master and Servant—Assumption of Risk—Contributory Negli-
    gence.—It is the duty of a master to be reasonably careful to pre-
    vent accidents and injuries to his servants, and his failure to do
    so, will render him liable, unless the servant assumes the risks or
    contributes to the injury, by his negligence.

    FRED FORCHT and CHARLES W. MORRIS for appellant.

    ELMER C. UNDERWOOD, WALTER STOKES and D. R.
CARPENTER for appellee.

OPINION OF THE COURT BY JUDGE HURT—Affirming.

Searcy Battle was an employ of the appellant, P. Ban-
non Pipe Line Company. He was a strong, healthy man,
thirty-six years of age, and of sober, industrious habits.
He had been an employe of the appellant, for several
months, and had been doing the same work for it, during
that time. The appellant owned and operated a factory
for the making of terra cotta tile, pipe, and brick, and
used, for the purpose, large quantities of clay and shale.
The clay and shale were brought to the factory in freight
cars, which had doors, near each end of the cars, which
could be opened, and the contents of the cars, allowed to
drop underneath the cars. The cars were brought
under a shed, attached to the factory, upon a switch,
which connected with the main line of the railroad, and
underneath the shed, and below the surface of the floor,
were two "conveyors." The "conveyors" were troughs,
the tops of which were even with the surface of the floor,
and the exposed portions, were a length equal to the
width of the switch track, and each of them, was about
eighteen inches in width and about fifteen inches in depth.
Within the trough, was a revolving shaft, which was
armed with numerous sharp blades, set upon the shaft in
a spiral fashion, making it into a kind of giant screw.
The shaft, at one end, was set in a fixed bearing, which
held it in position, while at the other end, it was attached
to a shaft, which, in turn, was attached to, and operated
by a steam engine, within the factory buildings, and about
fifty feet from the opening. This engine propelled all
the machinery made use of at the factory. When the cars,

loaded with shale and clay, were brought into the shed, upon the switch track, the doors were opened, and the contents allowed to fall into the troughs of the "conveyors," where, by the action of the revolving shaft, armed with the steel blades, set in spiral fashion, the clay and shale were crushed, and the crushed product was carried forward, to a belt, which carried and dumped it into a hopper, where it was ground into a condition to be turned into the finished products of the factory. When the cars were emptied of their contents and removed, the portions of the clay and shale, which were left upon the floor of the shed, were gathered by shovels or spades, and thrown into the "conveyors." The shafts in the "conveyors," made about thirty revolutions per minute. The two "conveyors," were about twenty feet apart. According to the evidence for appellee, the floor of the shed adjoining one of the "conveyors," was faced with boards, making a firm foundation, while the other, and the one at which Battle suffered injuries, as will hereafter be related, was not provided with such facing, but the evidence for appellant, is to the effect, that the floors, upon each side of both "conveyors," were similarly faced. The action of the shafts, in the "conveyors," was controlled by a lever, which was to the side of the switch track. When the steam engine was in operation, the shifting of the lever, at either "conveyor," would start it to operating, and a shifting of the lever back to its original position, would stop the shaft instantly. Either "conveyor" could be operated independently of the other. The duties assigned to Battle, were to unload the cars, of their contents, into the "conveyors," and to shovel the portions of their contents, which did not fall from the cars, directly into the "conveyors," into them, with a shovel. In so doing, he was assisted by an employe, whose name was Smith. On November 24, 1915, a car had been emptied and removed from the shed, and by the direction of the foreman, who was immediately present, at the time, Battle and Smith were shoveling the contents of the car, which had not fallen directly into the "conveyors," into the "conveyor," the floor, at the sides of which there was no board platform, when Battle, from some inadvertence, or accident, stepped, with his right foot, into the "conveyor," when he, immediately, shouted to stop the machine, when Smith, alone, or together with the foreman, sprang to the lever, and shifted it, to the position, so as to stop the shaft. At this point, the evidence is very contradictory.

The foreman testified, that he and Smith sprang to the lever, at the same time, and shifted it, when the shaft, immediately, ceased to revolve, while Smith testified, that the foreman did not attempt to shift the lever, but ran to the engine, about fifty feet away, and caused the power to be turned off the machinery at that point; that the lever, although shifted, so as to stop the revolutions of the shaft, the shaft did not cease to revolve, for three or four minutes, and not until the engine was stopped; that, at the time Battle called to stop the shaft, and when the lever was shifted, so as to stop it, Battle's foot was caught in the "conveyor," only to the extent of up to the instep, but, when the shaft ceased to revolve, his right leg had been drawn into it up to a point, between his knee and hip joint, and his mangled and broken leg was wound around the shaft. When he stepped into the "conveyor," he was about the center of the switch track, or the middle of the exposed portion of the "conveyor," but, when the shaft ceased to revolve, he had been drawn, to the side, to which the spiral motion of the blades drew the contents of the "conveyor," a distance of between two and three feet, although he was resisting being drawn into it, by clinging, with his hands, to the objects, within his reach. He was removed as speedily as practicable, to a hospital, and a surgeon was called, at once, but, the necessity of unscrewing the bolts, which held the fastenings, took such time, that he was not removed from his painful position, for thirty or forty minutes. As soon as the necessary preparations could be made, his leg was amputated, but, he died within about two hours, after the operation, from the shock, suffered by him, and loss of blood. While the evidence, in regard to the condition of the machinery, at the time of the injury, was contradictory, there was evidence which tended to prove, that the lever which controlled the operation of the "conveyor," was provided with what is denominated, a "friction clutch," and that this clutch had been out of repair and defective, for some time, previous to the injury; that the lever, when shifted to stop the operation of the shaft, in the trough of the "conveyor," would not cause it to cease revolving, for fifteen or twenty seconds; that it had been necessary for the engineer of appellant to work upon and repair the lever and its attachments and adjustments, as often as twice per week, for five or six weeks, and on the morning of the day upon which the injury was incurred, that the

lever could not be made to start the "conveyor" to moving, and Battle reported this fact to the engineer, who, with tools, came and worked upon it, for a time, and then directed Battle to shift the lever to start up the operation of the "conveyor," which he did, and it started up, at once, and the engineer, then assured him, it was all right. There was no occasion to make use of the lever any more during that day, until it was attempted to be shifted, to stop the movements of the "conveyor," when Battle had stepped into it, when the lever failed to stop it, and the revolving of the shaft ceased only, when the power of the engine was stopped. It was proved, by expert machinists, who were acquainted with such machinery and had examined the "conveyor," that, if the lever was in proper repair, the shifting of it would cause the shaft to cease revolving instantly. Smith testifies, that he did not know how Battle came to step into the "conveyor's" trough, as his back was to him, at that time; the first thing, he saw of it, his foot was in it, and he cried out to stop the machine. The foreman testified, that Battle's side was to the trough, as he was gathering up the clay, with a shovel, and he just carelessly stepped into it. The medical experts gave testimony, to the effect, that, a healthy man, who had suffered an injury, no greater, than the loss of a foot, or the loss of a portion of a foot, would almost, certainly recover, with proper and seasonable treatment, but, that one suffering the extent of the injuries of Battle, would most probably die, from the shock, and loss of blood.

The administrator of decedent, instituted this action to recover the damages, suffered by the estate of decedent, because of his death, alleging, that the death was caused by the negligence of the employer. The appellant denied, that any negligence, upon its part, contributed to the decedent's death, and in addition, interposed pleas of contributory negligence and assumption of risks upon the part of decedent, as the proximate cause of his death. The jury returned a verdict for appellee, and fixed the damages, at the sum of $1,500.00, and a judgment was rendered accordingly. The appellant's motion for a new trial being overruled, it has appealed, and urges, that the trial court erred in overruling its motion for a directed verdict, in its favor, at the close of the testimony for appellee, and at the close of all the testimony, as the only ground for a reversal.

The trough, containing the "conveyor," was open and obvious. The danger incident to stepping into it, was obvious, and must be appreciated by any responsible being. Battle seems to have stepped into it, from the fact, that he neglected to exercise ordinary care for his own safety.

If the facts, which the evidence for appellee tends to prove, are to be believed, and the inferences to be drawn therefrom, the negligence of Battle, would have only cost him his foot or a portion of his foot, and from such an injury, he would have escaped with his life, if the lever, which controlled the conveyor, had been in proper repair. Either Smith, alone, or he and the foreman, together, shifted the lever, instantly, upon discovering the peril of Battle, and if it had caused the revolving shaft to have instantly ceased, its movements, as the proof tends to show, it would have done, if not defective and in proper repair, his life would not have been sacrificed. The proof for appellee conduces to prove, that the lever, when shifted to stop the revolving shaft, failed to accomplish that purpose, and that the shaft did not cease to revolve, until the foreman had run to the engine, and procured its operation to cease. Assuming, then, for the present, that the evidence was of such a character, as to require submission to the jury, upon the question, as to whether or not the loss of his foot, alone, would not have caused his death, the question, then arises, as to whether or not, it was a duty, which the appellant, as the master owed to the deceased, as its servant, to use ordinary care to maintain the lever and its adjustments, in such a condition, that it would perform its functions properly, and was its failure to do so, negligence as to him?

It is insisted, that the negligence of the decedent, in stepping into the "conveyor" concurred in the negligence, if any, of the appellant, in failing to maintain the machinery in reasonably good repair, and for that reason, the appellee can not recover, because under such circumstances, the negligence of the decedent, was the proximate cause of his death, and in support of this contention, the principle, embodied in the cases of Bauer v. I. C. R. R. Co., 156 Ky. 183, and Smith v. C. N. O. & T. P. Ry. Co., 146 Ky. 568, are relied upon, but, they do not seem to be in point. Those were cases, wherein the injured parties were licensees, to whom the employees of the railroad company owed a lookout duty, but the negli-

gence of the licensees was such, that the lookout duty, was not effective. Contributory negligence is not a bar to a recovery for an injury, unless, except for the contributory negligence, the injury would not have occurred. Neither does it preclude a recovery for an injury if the party perpetrating the injury, could have, by the exercise of ordinary care, averted the consequences of the injured one's negligence where a duty rests upon him to take care. Sullivan v. Louisville Bridge Co., 9 Bush 90; P. & M. R. R. Co. v. Hoehl, 12 Bush 43; L. & N. R. R. Co. v. Robinson, 4 Bush, 509.

Although the employees of a railroad company do not owe any duty to a trespasser, except to avoid injury to him, if they can, after having knowledge of his peril, they do owe to him the latter duty, which the dictates of civilization provide as an obligation to every one, and if they injure a trespasser, when by ordinary care, after discovery of his peril, they could have avoided injury to him, their negligence is the proximate cause of his injury, although he was first negligent. It seems, from analogy to the above principles, that where a duty to avoid injury to any one, although he may be a trespasser, exists, that the duty requires, that although slight injury may be unavoidable, the duty is incumbent, not to inflict any greater injury, than can be avoided, although the injured one may, himself, have been negligent. The application of these principles does not involve any question of comparative negligence, but, defines the liability of each one for his own negligence.

The rule applying to negligence, as between master and servant, follows, the same rules, as above stated, and a servant may recover, notwithstanding his own negligence, if the consequences of his negligence could have been avoided by the exercise of ordinary care on the part of the master, with relation to such matters, about which it was the duty of the master to exercise reasonable care.

A rule of general application to the duties of a master, is, that, he owes his employees, the duty to be reasonably careful to prevent accidents and injuries to his servant, and his failure to do so, will render him liable, and he can not avoid the liability, unless the servant assumes the risk, or contributes to the injury by his own negligence, and among the primary duties, which rest upon the master, is to exercise care to provide a reasonably safe place for the servant to work, and reasonably safe

machinery and appliances with which to work. The machinery may be inherently dangerous in its use, but, it should be kept in reasonably fit condition for the use, in which it is employed. Buey's Admx. v. Chess & Wymond Co., 27 R. 198; C. N. O. & T. P. Ry. Co. v. Ashcraft, 116 S. W. 297; Conrad Tanning Co. v. Munsey, 25 R. 936; Quaid v. Cornwall, 13 Bush 601.

In the instant case, the "conveyor" was obviously a dangerous instrumentality. It was open and necessarily so, for the purposes for which it was used. It was in the very place of the servant's work, and the machine with which it was his duty to work. It is a thing into which an employe, working about it, might fall, or inadvertently, step into. The master had provided it with the lever for the purpose of starting it into motion, or for stopping it, when necessity therefor occurred. While it was the duty of the servant to use care not to step into it, but, in assuming the risk of employment in working in the place, and in close proximity to the device, he had a right to rely upon the fact, that it was so provided, that the use of the lever, would, instantly, stop its action. Hence, the master owed the servant the duty to use care to maintain the lever, in a reasonably good state of repair, so that it would perform the functions intended. Owing this duty, the appellant was not liable to the decedent, for any damages suffered by him for his negligent stepping into the "conveyor," but he was liable for any damages suffered by the failure of the lever to stop the machine, if such failure was the result of negligence in keping the lever in repair, and which damages would not have been suffered except for the defects in the lever.

(b) It is insisted, that a verdict should have been directed for appellant, because, it is argued, that it is a mere matter of speculation to undertake to determine, that the crushing of decedent's foot, and for which injury, the appellant is not liable, did not cause his death, but, that the additional injuries, which he suffered, because of the defective lever, did cause the death. The recovery can not be sustained, unless the defective lever was the proximate cause of the death. The proximate cause of death is the one, which causes the fatal injury. The fact, that decedent would have survived the crushing of his foot, is a fact, not impossible of demonstration by evidence. The common experience of men, teaches, that such a wound to a strong, healthy man, is not reasonably calculated to produce death. Such was the expert evi-

dence heard upon the trial. The tables of mortality are, uniformly, held, to be competent evidence of the probable duration of a life, though, an individual, whose expectancy of life is forty years, may not live a week.

One could not be excused for causing a death, by a fatal wound, because the victim was then suffering from an insignificant wound, which by reason of complications, might cause death.

The judgment is affirmed.