## Warfield Natural Gas Co. v. Clark's Administratrix.

(Decided Dec. 18, 1934.)

DYSARD & TINSLEY for appellant.

MARTIN & SMITH and P. H. VINCENT for appellee.

OPINION OF THE COURT BY CREAL, COMMISSIONER—
Affirming.

Nancy Clark, mother of Harry A. Clark, deceased, as administratrix of his estate, recovered judgment against the Warfield Natural Gas Company, a corporation, hereinafter referred to as the gas company or appellant, for $11,500 damages for his death alleged to have been caused by the wrongful, willful, and negligent act of the gas company in cutting off and discontinuing the supply of natural gas at the home of the administratrix, and the gas company is appealing.

Appellant traversed the allegations of appellee's petition, and in a second paragraph set out at length Mrs. Clark's application to it for gas to be furnished to her residence which was accepted by it. Under a provision in the application, it and the printed rules and regulations on the reverse side thereof constituted the

contract between the parties. It further alleged that, because of Mrs. Clark's delinquency and nonpayment of bills rendered for gas furnished, after proper notice and demand had been made, it shut off the gas and discontinued service to her, as it was authorized to do by the provisions of the contract.

By reply, appellee denied the affirmative allegations of the answer, and alleged that appellant rendered a bill in excess of the amount actually due for gas furnished under the contract, and, because of nonpayment of the excessive bill, wrongfully cut off the gas as alleged in the petition.

In an amended answer, appellant pleaded that appellee's intestate was guilty of contributory negligence in remaining in his mother's home knowing that the supply of gas had been cut off, and that his sickness and death resulted as a direct and proximate result of such negligence upon his part, and but for which it would not have occurred. By an agreed order, it was stipulated that the amended answer and the affirmative matter in the reply stand controverted of record.

The application made by Mrs. Clark and accepted by the company reads:

"Clark, Nancy

"Application for Gas for Domestic Purposes To Warfield Natural Gas Co.

"I hereby apply for natural gas by meter at 106 31st St., Ash. Ky. occupied as Res. which gas I agree to use at my own risk, and to pay for the same at the rate published from time to time for the district in which said premises are situated, until you shall have written notice from me to discontinue the supply.

"This application when accepted by you, shall, together with your present rules and regulations, printed on the reverse side hereof, and such other reasonable rules and regulations as may hereafter be adopted by you, constitute a contract between you and the undersigned applicant. Accepted:

"C. G. Fizer [Signature]                    Nancy Clark

"Meter Order No. 27682    Amount of Deposit.——

"Guarantee No. 36467                    Deposit No.

"Mrs. A. C. Dennis—108—31st St."

So much of the printed rules and regulations on the reverse side of the application as is pertinent reads:

"3. The amount payable for the gas furnished during each month shall be due on the first day of the following month and unless paid on or before the 15th of such month the gas will be shut off without further notice. In the event service is discontinued during any month, the amount payable shall be due immediately upon such discontinuance.

"4. When the published rates in any district provide for a discount for payment of bills on or before the 10th day of the month, and such 10th day falls upon a Sunday or Legal Holiday, then bill paid on the following day will be subject to such discount."

"7. The Company reserves the right to shut off the gas at any time and remove its property from the premises for any of the following reasons: [a] for repairs; [b] for nonpayment of bills when due."

The grounds argued and relied upon for reversal call for a review of the evidence. The undisputed facts show that within four or five days after January 11, 1933, the company rendered Mrs. Clark a bill for gas furnished by it between December 9, 1932, and January 10, 1933. The gross amount due as set out in the bill presented was $7.68 and the net amount $7.44. There was also included a balance for $3 which increased the net and gross amounts of the bill accordingly. Near the upper corner on each side of the bill, printed in prominent type, are the words, "Last day to pay net amount January 26, 1933." Some time after February 1, one of appellant's employees went to the home of Mrs. Clark with another bill of like character but smaller in size than the first. Failing to find Mrs. Clark at home, he left it with Miss Flora Kaysee, who roomed there, and she later delivered it to Mrs. Clark. Miss Kaysee testified that to the best of her recollection this bill was delivered in the latter part of January, but the company's representative does not fix the time more definitely than to say it was about the 1st of February. A representative of the company testified that he went to the home of Mrs. Clark after the second bill was rendered, and, again failing to find her at home, asked some children playing in the yard to tell her that the

gas would be cut off if she did not pay her bill. Mrs. Clark testified that she did not receive the message, and there is no evidence that she did. About 1 p. m. on February 6, 1933, an employee of appellant went to Mrs. Clark's home, and Miss Kaysee, who was the only person there at the time, testified that, when she went to answer the knock at the door, the man told her he was there to see about the bill, and, upon being informed that Mrs. Clark was not at home, said he would have to turn the gas off, and proceeded to do so.

Mrs. Clark, a widow with five children, of whom deceased, age 14, was the oldest, was working for the relief committee in Ashland, and was paid in script, which it appears in evidence had been received by appellant in payment of gas bills. She testified that, when she returned from her work on the afternoon of February 6 and found the gas turned off, she waited the return of her children from school. Upon their arrival she sent her two youngest, who are girls, and later one of the boys, to the home of her mother nearby, but, on account of the illness of her mother and visitors in the home, there was not room to accommodate more of her family. Decedent was a newsboy, and it was his custom to sell papers after school. Following his usual custom, he went down town, and, after selling his papers, returned home about 6 p. m. He and his mother set up a coal stove and made a fire in it, and, because there was no flue in the house, ran the stovepipe out the window. This set the house on fire, and they were forced to put out the fire in the stove. According to the evidence, February 6 was a cold day with possibly rain or snow. At least, while the boy was out selling papers, the weather was very inclement.

The evidence shows that on the day the gas was cut off and on the previous day deceased had been complaining of some neuritic condition in his arm and shoulder which caused great pain and discomfort. Mrs. Clark testified that, because of pain in the boy's arm, he could not lie down, so she wrapped him in blankets and he sat in a chair the remainder of the night; that toward morning he began "chilling." She took him to work with her the following morning, and called on Dr. Debord, but for some reason this doctor could not attend the child, so she took him to Dr. Swope's home. Dr. Swope was not at home, but, when Mrs. Swope saw the child, she sent him to the home of Mrs. Charlie

Clark, his aunt, and had the doctor see him there in the afternoon; that Dr. Swope said he thought the boy was going into pneumonia. This diagnosis proved to be correct, and he died on February 12 of that disease.

Mrs. Clark testified that she never received any notice that the gas would be cut off. There is evidence that she procured some brick preparatory to having a flue built, and had also procured a stove and some coal. Her explanation of making these preparations for heating with coal was that she had received information that the gas company would no longer receive script in payment of bills. She was asked if on Sunday before the gas was cut off, at the home of Green Dennis and in the presence of him, Allie Moore, Annie Dennis, and Eliza Tackett, she stated that she had a coal stove and that the company would be there in a day or two to turn the gas off and she did not give a damn if they did. She denied making such statement. Mr. Dennis and others mentioned as present testified that she did make such statement.

Mrs. Fannie Clark, an aunt of deceased, testified that, as was their usual custom while attending school, deceased and his sister took lunch with her on Monday, February 6; that he expressed doubt as to whether he would sell papers that afternoon on account of a pain in his shoulder; that on the following day he came to her home in a taxicab, saying that Mrs. Swope had sent him there with instructions that he be put to bed and his shoulder bathed; that Mrs. Swope had taken his temperature and found it to be 102; that he ran a high temperature from that time until his death. She stated that she put him to bed on a divan in the living room and carried out the instructions sent by Mrs. Swope. When asked on cross-examination if it would have been all right for the boy to have spent the night with her on Monday, she stated that she only had one bed. Dr. Swope, who was called to see the boy on Tuesday and who attended him until his death, stated that on the first visit he found symptoms of beginning and development of pneumonia; that the boy later died of that disease. He stated that the boy also had arthritis or neuritis in one shoulder, that this disease of the nerves had no connection with his death, and in fact he got better of the neuritis before his death. He stated that exposure would produce reduced vitality and shock to the system whereby cold developed and pneumonia fol-

lowed. While the doctor was not explicit in all his statements, in answer to hypothetical questions, he gave as his opinion that the pneumonia was caused by exposure in the cold house rather than by exposure to which the boy was subjected while on the street selling his papers. He further stated that there was a difference between exposure to cold in the open and exposure to cold in a room; that, while in the open air and walking from place to place, the circulation was kept up, and one would hardly be considered exposed in such circumstances. A portion of his evidence on direct examination reads:

"Q. When coming in from the open air in such weather as it was in the afternoon and evening of last February 6th and being in a room from which the gas had been turned off for a period of about four hours, would you consider that an exposure of a character that would produce pneumonia? A. Yes, sir; if they had no provisions for fire, or anything of that sort, I would think so. * * *

"Q. Assuming that the patient, after having been exposed to a cold room in the manner I have stated, should develop, along about three o'clock the next morning, chills, I will ask you to say whether or not that is in accordance with the general history of pneumonia cases? A. Yes, sir; pneumonia will develop within a few days often times.

"Q. Assuming that that boy was out on the street selling papers on Monday afternoon for two or three hours; that when he went home, he was in a room without gas in the kind of weather that it was last February 6th; that he was wrapped in blankets that evening; that at three o'clock the next morning he began to chill, and his temperature was found by you, as you have stated, in the afternoon, or about noon, and there was no heat in the house. In your opinion did the pneumonia develop from the fact that there was no warmth in the room? A. I would rather think so.

"Q. That's your judgment about it? A. That's my judgment that it could be a very probable factor that that could cause it. The child, after being out selling his papers and running and getting hot and tired, and coming home without any heat in

the house, I * * * After running and selling his papers, and having no heat in the house when he came in, he could then develop colds and pneumonia following than otherwise perhaps.

"Q. Was there anything in the history of the case that indicated to you that anything else other than those conditions caused his death? A. None that I know of."

On cross-examination he stated in substance that pneumonia could be caused by exposure in the open, and, after considerable interrogation, he was asked: "Are you assuming that this exposure before he was wrapped up was the cause of the pneumonia?" and replied: "I was assuming that the pneumonia was due to exposure, due to the turning off of the gas in the house."

It is first argued by counsel for appellant that the court erred in overruling its motion for peremptory instruction. A number of reasons are assigned why such instruction should have been given. It is first argued that it is shown by evidence that Mrs. Clark was delinquent, and that under the provisions of the contract the gas company had a right to shut off the gas for nonpayment of her bill; that the word "month" as used in the contract between the parties denotes a period between a day of a calendar month and a corresponding day in the succeeding calendar month. As supporting this first proposition, Tackett v. Prestonsburg Water Co., 238 Ky. 613, 38 S. W. (2d) 687, and a number of other cases are cited. Those cases recognize and follow the general rule prevailing in this and practically all jurisdictions that public service corporations have a right to make and enforce reasonable rules for the conduct of their business, and that a rule providing for discontinuance of service to a customer for nonpayment of bills is reasonable. The evidence shows, and it is not denied, that Mrs. Clark had not paid the bill rendered for gas furnished between December 9, 1932, and January 10, 1933, but it remains to be determined whether under the provisions of the contract the right had accrued to appellant to discontinue service to her.

On the second proposition, there seems to be a confusion of authority with no cases cited that are directly in point. In 5 Words and Phrases, First Series p. 4574, it is said:

"At common law the word 'month,' when used without qualification, meant a lunar month, or twenty-eight days. [Citing authorities]. * * * Which rule was abolished by statute in England in 1850. [Citing authorities.] In the United States the common-law rule was followed in some of the earlier cases. [Citing authorities.] But the holdings now seem to be uniform that the word, in whatever connection it is used, signifies a calendar month, unless a contrary intent is indicated, and in many states this rule has been fixed by statute. [Citing authorities including Pyle v. Maulding, 30 Ky. (7 J. J. Marsh) 202; Hardin v. Major, 7 Ky. (4 Bibb) 104, 105; Hopkins v. Chambers, 23 Ky. (7 T. B. Mon.) 257, 262]."

In the case of McGinn v. State, 46 Neb. 427, 65 N. W. 46, 47, 30 L. R. A. 450, 50 Am. St. Rep. 617, cited by counsel for appellant, it is said:

"The term 'calendar month,' whether employed in statutes or contracts, and not appearing to have been used in a different sense, denotes a period terminating with the day of the succeeding month numerically corresponding to the day of its beginning, less one. If there be no corresponding day of the succeeding month, it terminates with the last day thereof."

The case of Daley v. Anderson, 7 Wyo. 1. 48 P. 839, 75 Am. St. Rep. 870, cited by counsel for appellant, is to the same effect. See, also, State v. White, 73 Fla. 426, 74 So. 486; Page v. O'Sullivan, 159 Ky. 703, 169 S. W. 542. In the long list of cases cited and in Words and Phrases, supra, and in many other cases not cited, it is held that the word "month" as used in statutes, contracts, etc., means a calendar month as distinguished from the lunar month, unless the contrary is expressed. But the controversy between counsel here is whether the term "calendar month" means only a month as delimited by the calendar or may also mean a period beginning on a day in one calendar month and running to a corresponding day in the succeeding month. Counsel for appellee of course hold to the former view and cite 62 C. J. 969; 26 R. C. L. 732; Sovereign Camp, W. O. W., v. Reed, 208 Ala. 457, 94 So. 910; Fairchild-Gilmore-Wilton Co. v. Southern Refining Co., 158 Cal. 264, 110 P. 951, 953; Ky. Stats. sec. 452, and subdivision 25

of section 732 of the Civil Code of Practice. The section of the statute cited is in a chapter relating to the construction of statutes, and the section of the Code cited relates to the construction of provisions of the Code. The case of Fairchild-Gilmore-Wilton Co. v. Southern Refining Co. is more directly in point than any of the other authorities cited. In that case two contracts had been made, one made January 3, 1906, was for the sale of 4,000 tons of asphalt to be delivered within one year from January 1, the delivery to be made as rapidly as possible, provided that not more than 400 tons were to be called for in any one month. Payments were to be made on the 10th day of each month for all material delivered during the preceding month. The second contract was made on May 6, 1906, and is identical in language with the first, except as to date; and the time in which the asphalt was to be taken, which was one year from May 16, 1906, and further that the asphalt furnished under the contract was to be in addition to the amount to be furnished under the former contract. In summing up the conclusion as to the construction to be given the terms of the contract, it was said:

"We think the proper construction of the contract of May 16th is that by the 'one month,' therein referred to, a calendar month was intended and understood. This is shown by the clause immediately following, to the effect that payments were to be made on the 10th of each month for all the asphalt delivered during the preceding month. Evidently both of these kindred provisions refer to the months of the calendar."

In Derby v. Dancey, 112 La. 891, 36 So. 795, 796, it is said:

"A month is a definite period of time, commencing on the 1st day thereof, and ending on the 28th, 29th, 30th, or 31st day."

From an exhaustive research of authorities, in addition to those cited by counsel for the respective parties, we have been unable to find any fixed rule for determining the meaning of the word "month" as used in contracts, and the failure to find such a rule is not disappointing, since it is apparent at first blush that the meaning of the term, like many others used in contracts, must be determined from the particular sense in which

it is used. Where there is doubt or ambiguity in the language of a contract, courts will resort to established rules of construction in determining its meaning. As will be seen from the quoted provisions of the contract, the amount payable for gas furnished during each month shall be due on the 1st day of the following month, and, unless paid on or before the 15th of each month, the gas will be shut off without further notice.

In Webster's New International Dictionary, the words "calendar month" are defined as "[1] any of the months as adjusted in the calendar, now the Gregorian. April, June, September, and November now contain 30 days, and the rest 31, except February, which has 28 and, in leap years, 29. [2] The time from any day of such a month to the corresponding day [if any; if not, to the last day] of the next month."

Standing alone, the quoted excerpt from the rules and regulations on the reverse side of the application would clearly indicate that the word "month" was used in the sense as first defined in the dictionary, and this construction should be adopted unless the instrument as a whole indicates that it was used in the other sense, or unless it should be made to appear that, by their course of dealing under the contract, the parties themselves put the latter construction upon it. When considered as a whole, there is nothing in the contract to indicate that the term was used other than in the sense of a month as adjusted or delimited by the calendar, nor is there any proof as to the conduct or dealings of the parties under it to warrant a conclusion that they gave it any other construction. The use of the kindred terms "each month," "on the first day of the following month," and "the 15th of each month," as said in Fairchild-Gilmore-Wilton Co. v. Southern Refining Co. supra, indicates not only a "calendar month" but "a month of the calendar" was meant and understood. If any doubt remained as to the propriety and reasonableness of this construction, it would be put to rest by the prevailing rule that ambiguous contracts will be most strongly construed against the person who drafted them. Wallace v. Cook, 190 Ky. 262, 227 S. W. 279; Glenmary Land Co. v. Stewart, 217 Ky. 635, 290 S. W. 503; Hawkins & Chamberlain v. Mathews, 242 Ky. 732, 47 S. W. (2d) 547. Appellant drafted this contract, and it is couched in terms adopted by it. Therefore,

under the authorities cited, the contract will be construed most strongly against it.

It is further argued that the court should have sustained appellant's motion for a peremptory instruction because the evidence shows that decedent voluntarily remained in his mother's home all night when he knew the gas had been cut off, and that, if his death can be attributed to that fact, he was guilty of contributory negligence as a matter of law; that, if his death was from pneumonia developed from lack of heat, the proximate cause was not the cutting off of the gas, but was his voluntary act in remaining in the house when he was acquainted with all the conditions; that, because the jury was left to speculate as to the cause of deceased's death, there was a failure of proof. Counsel cite authorities to the effect: (1) A child 14 years of age or more is presumed to know right from wrong, and is responsible for his acts; (2) that contributory negligence is a complete defense whether it be the sole or only a contributory cause of the injury; (3) that, if the facts upon which a plea of contributory negligence is conceded or proven by undisputed testimony and the reasonable inferences which may be drawn from undisputed facts are such that ordinarily prudent men may not differ about them, the question of contributory negligence becomes one of law. It is further asserted by counsel that, since appellee is decedent's mother and will be the beneficiary of any recovery, she is not entitled to recover if she compelled the boy to remain with her in the house all night. The evidence discloses that Mrs. Clark was a very poor woman, and her only income was derived from her work for the relief committee and the earnings of her son as a newsboy. Her mother lived nearby, but was ill, and her home was already overcrowded. The aunt who lived further away had no sleeping accommodations for other than the members of her own family. There is no evidence whatever that Mrs. Clark or her son had any other place where they might seek refuge from the cold. In the circumstances, it would be an unwarranted extension of the doctrine of contributory negligence to hold as a matter of law that either the mother or son were guilty of such negligence.

"* * * The general rule is that the question of contributory negligence is one for the jury where, con-

sidered in the light of proven facts and circumstances, there is room for honest difference of opinion among intelligent men as to whether the conduct of the injured party was that of an ordinarily prudent man. McClelland's Adm'r v. Miller Creek Railroad Company, 170 Ky. 1, 185 S. W. 142; City of Henderson v. Book, 187 Ky. 612, 219 S. W. 787; P. Bannon Pipe Line Company v. Battle's Adm'r, 183 Ky. 367, 209 S. W. 4.'' Chesapeake & O. Ry. v. Hicks' Adm'r, 248 Ky. 510, 58 S. W. (2d) 910, 911.

While the evidence shows that decedent was exposed to cold and inclement weather while selling papers on the afternoon of the 6th, there is nothing to indicate that pneumonia began to develop until the following day and after he had remained in the cold room all night. The attending physician gave as his opinion that the pneumonia which resulted in decedent's death was caused by his remaining in the cold room all night. This, in connection with the other proven facts and circumstances, made an issue as to whether the alleged negligence of appellant was the proximate cause of the disease resulting in decedent's death.

As the second ground for reversal, it is argued that the court erred in instructing the jury. Instruction No. 1 is attacked on the ground that it amounts to a peremptory instruction for appellee, since it submits no issue for the determination of the jury and leaves nothing for the jury's finding except the amount to be awarded. Under that instruction, the jury was told in substance that the amount payable for gas for the period from December 9 to January 10 was due on the 1st day of February, and that nonpayment thereof on or before the latter date gave appellant the right to shut off the gas by giving reasonable notice of its intention so to do, and that, if the amount due remained unpaid on February 15, appellant had the right to cut off the gas without further notice, and that, ''if the jury believe and find from the evidence that defendant wrongfully cut off the gas from plaintiff's premises before February 15, 1933, and that she did not consent thereto and was not given and did not have notice for such reasonable time prior to the shutting off same, as would give her reasonable opportunity to pay the bill or find other means of providing substantially the warmth which the continued use of the gas would have afforded,

and that as a direct result thereof her intestate contracted pneumonia from which and as a direct result thereof, he died, then you will find for plaintiff and fix her damages in accordance with instruction Number 3.''

The undisputed evidence shows that Mrs. Clark owed for gas furnished after December 9, and appellant is not contending that it had a right to shut off the gas for nonpayment of the $3 balance shown on the bill rendered. Under the lower court's interpretation of the contract, which, as already indicated, we have found to be correct, the bill was not due until February 1, and the company without further notice had a right to cut off the gas if it was not paid on or before February 15. Whether the trial judge was correct in his construction of the contract with respect to the right of the company to cut off the gas before February 15 by giving reasonable notice of its intention so to do we need not determine. If this interpretation was correct, the question should have been submitted to the jury, and, if not, then that portion of the instruction was favorable rather than prejudicial to appellant.

Instruction No. 2 is also attacked as erroneous. This instruction relates to the $3 balance on the bill rendered. We have given no attention to the issue made by pleading concerning this alleged excessive item in the bill rendered, since it is not material to a determination of this appeal. This instruction is not erroneous or prejudicial, since the jury could not find for appellee under it unless they believed from the evidence that her intestate contracted pneumonia, which caused his death, as a direct result of the wrongful act of appellant in cutting off the gas; and, under the proven facts, their finding would necessarily have been the same if this instruction had not been given.

Instruction No. 3 on the measure of damage is also called in question by appellant. This instruction correctly stated the measure of damage, and is only attacked on the ground that it is based upon instruction 1 and 2. If either of those instructions should have been given, it follows that instruction No. 3 was proper.

Insistence that instruction No. 4 on contributory negligence is erroneous on the ground that it was not in concrete form is without merit. It properly presents that defense made by appellant.

It is next urged that counsel for appellee made unwarranted and prejudicial statements in argument before the jury. A number of alleged prejudicial statements made by counsel are set out in the bill of exceptions. While counsel for appellee may have unduly elaborated and enlarged on some matters in evidence, there was evidence, or reasonable inferences to be drawn from it, to form a basis for most of the statements made by counsel. There are some statements which are not based upon evidence, and, while improper, it is very apparent that they were made in reply to equally improper argument made by counsel for appellant.

Finally, it is argued that appellee made out the case by her own testimony; that as the mother of decedent she was the beneficiary and entitled to any sum recovered in the action; that appellant objected to her evidence, and moved the court to exclude all of it; and that the court erred in overruling its motion. A number of cases are cited as supporting this contention, but all these cases are based on the provisions of section 606 of the Civil Code of Practice prior to its amendment in 1932. Under chapter 59, Acts of the General Assembly, 1932, subdivision 2 of section 606 of the Civil Code of Practice was amended so as to except from its provisions the evidence of persons testifying for themselves, "in actions for personal injury, death or damage to property by negligence or tortious acts." This amendment was referred to and applied in the recent case of Colston's Adm'r v. C., N. O. & T. P. Ry. Co., 253 Ky. 512, 69 S. W. (2d) 1072. However, counsel for appellant insist that this is an action for breach of contract, and the Code provisions only apply to actions ex delicto. While the matters complained of by appellant had their origin in a contract, the gravamen of the action is the alleged tortious and negligent acts of appellant which resulted in the death of appellee's intestate. See 1 R. C. L 321; Jackson v. Central Torpedo Co., 117 Okl. 245, 246 P. 426, 46 A. L. R. 338. Our conclusion is that under the Code amendment appellee was a competent witness.

Judgment affirmed.

Whole court sitting.