**NILES et al. v. LUTTRELL et al.**

No. 125.

District Court, W. D. Kentucky,
Bowling Green.

July 12, 1945.

Norton L. Goldsmith, and E. J. Wells, both of Louisville, Ky., for plaintiffs.

Laurence B. Finn, of Bowling Green, Ky., and J. G. Smith, of Albany, Ky., for defendants.

SWINFORD, District Judge.

This is an action to enjoin a trespass.

On October 15, 1940, R. I. Luttrell and Clora Luttrell executed a writing, whereby they leased the oil and gas rights in their farm containing 450 acres to C. F. Lowther. The lease was shortly thereafter assigned and transferred to the plaintiffs.

The lease contained the following provision: "And further, to locate and commence a well on said premises within 30 days from the date hereof, or pay at the rate of 25 cents per acre annually, payable quarterly in advance, for each additional three months such location and commencement is delayed from time above mentioned for the location and commencement of such well until a well is commenced or this lease surrendered. Such payment shall be made direct to the Lessor or by check mailed to R. I. Luttrell at Seventy-Six P. O. Clinton County, Kentucky. The drilling of a non-productive well shall be accepted by the Lessor in lieu of delay rental for a period of one year from the date of its completion, at the expiration of which time the Lessee shall commence another well or resume the payment of delay rental. And the drilling of a second well, productive or otherwise, shall be full consideration to the Lessor for the grant hereby made to Lessee with exclusive right to drill one or more additional wells on the premises during the term of this lease."

On December 28, 1940, the plaintiffs moved machinery upon the leasehold and in the early part of January, 1941, began to drill an oil well. This was the only well drilled upon the leasehold and will be referred to as "Luttrel No. 1". The well was dug to a depth of 815 feet, without striking oil in commercial quantities. On May 25, 1941, the drilling ceased and the well was never sunk to any greater depth than 815 feet. On June 4, in an effort to bring the well into production, it was shot three times with nitroglycerin but without satisfactory results. Later on in the summer of 1941, August or September, the well was acidized. Notwithstanding these efforts on the part of the plaintiffs, the well did not produce oil in paying or commercial quantities. In fact, throughout the whole time covered by the record in this case, that is from May 1941, until the latter part of 1943 or early part of 1944, the oil produced only netted in royalties the sum of $8. Throughout this period the plaintiffs, at intervals, attempted to bring the well into production by various methods and employed one Parker, who testifies that he continued to attempt to pump oil until the last of 1943 or the first part of 1944.

R. I. Luttrell died on September 3, 1942. The date of the death of C. F. Lowther is not clear from the record but it is stated by one of the witnesses that he died sometime shortly after May 26, 1942. Another witness states that he died in 1941. The date of his death, however, is not important to the determination of any question raised in this law suit.

The defendant, Clora Luttrell, who was the wife of R. I. Luttrell, is now the owner of the property on which the lease was given. On April 3, 1944, she leased to her codefendant, S. B. Jarvis, all of the oil and mineral rights in the property. This action is to enjoin the defendants from interfering with the plaintiffs in the enjoyment of their property rights under the lease of October 15, 1940.

The first thing to be considered and determined is when was Luttrell No. 1 completed within the meaning of the law. On this question I must conclude that Luttrell No. 1 was completed after it had been acidized without results. The exact date of this is not definite from the proof but it may be fixed as of sometime in August or September of 1941. This is the closest date I can fix from the rather vague testimony of the plaintiffs. If September is established as the date of the completion, then it was the duty of the plaintiffs under the terms, of the lease to either pay the rental of 25 cents per acre, in advance, or to begin the drilling of a second well within twelve months after September, 1941. It is agreed that no rental was paid and that no second well was ever drilled.

In determining that the well was completed in September, 1941, I believe that

I have given a reasonable interpretation to the facts as developed. Most of these facts are undisputed. The well had been sunk to a depth of 815 feet, through the upper Sunnybrook and lower Sunnybrook sand and into the pencil cave sand. It had been shot with nitroglycerin and had been acidized with what was thought to be approved chemicals and with the proper processes. Pumping had been applied and so far as the record discloses the plaintiffs had done everything known to the art to bring the well into production. None of these conventional methods were successful. While there may be a difference of opinion as to the best methods to be employed, under the circumstances prevailing in this particular well, as is indicated by the testimony of the defendant, Jarvis, the plaintiffs certainly did what, in their judgment, experience and under the advice of others experienced in the business, they deemed proper and sufficient.

 Nevertheless I must conclude from all the evidence that after August, 1941, Luttrell No. 1 had reached the experimental stage and could not be considered a producing well, within the meaning of the terms of the lease. It is true that the plaintiffs continued to make efforts to bring this well into production until December, 1943, and apparently tried almost everything and anything that was suggested to them. It is also true that, according to the testimony of some of the witnesses, the well may yet be made productive but after August, 1941, when the drilling through the upper and lower Sunnybrook sands and through the pencil cave strata had been completed without satisfactory results, it would be extreme to hold that this well did not present a dry hole, within the understanding of the parties and the meaning of the lease at the time it was executed. It was the duty of the plaintiffs, under the terms of the lease and such reasonable implications as the law permits to be drawn from the terms of the lease, to prosecute the operation of this venture to recover oil on the defendants' premises, diligently and prudently. The real purpose of the lease and the interests of both the lessors and lessees was to recover oil in paying quantities. The mere formality of drilling a well and the interest aroused in the minds of the parties in this operation meant nothing unless oil was recovered. The plaintiffs could have extended the terms of their lease by paying the relatively nominal sum as rental. Instead of that they continued to dilly-dally with this dry hole. The smallness of the rental indicates that the lessors looked for their consideration for the lease to the early development of the leasehold and the production of oil. This is a circumstance to be considered in determining the implied conditions of the lease and what was in the minds of the parties at the time of its execution. Benedum-Trees Oil Co. v. Davis et al., 6 Cir., 107 F.2d 981.

In the leading case of Warfield Natural Gas Co. v. Allen et al., 248 Ky. 646, 59 S.W.2d 534, 536, 91 A.L.R. 890, the court, in this connection, made the following pertinent statement and cites authorities directly on the question of the relative responsibilities of the parties:

"It is a familiar principle in the law of contracts that, in the absence of specification of duties and obligations intended to be assumed, the law will imply an agreement to do and perform those things that according to reason and justice the parties should do in order to carry out the purpose for which the contract was made. Humphreys v. Central Kentucky Natural Gas Company, 190 Ky. 733, 229 S.W. 117, 21 A.L.R. 664. Though not expressed in the instrument, the law wrote into it as by implication certain covenants in order to manifest the purpose of the parties. They are just as effectual and binding as if specified. Among them is the obligation that the lessee would test and develop the property in good faith, and with reasonable diligence, to obtain production, and that it would prosecute operations diligently and prudently. Willis' Thornton on Oil and Gas, § 503, 40 C.J. 1064; Flanigan v. Stern, 204 Ky. 814, 265 S.W. 324; Union Gas & Oil Co. v. Diles, 200 Ky. 188, 254 S.W. 205; Bay State Petroleum Company v. Penn Lubricating Company, 121 Ky. 637, 87 S.W. 1102; Dinsmoor v. Combs, 177 Ky. 740, 198 S.W. 58, 59. These implied obligations include that of exercising good faith and the sound discretion of a prudent operator to drill to a depth that is reasonably necessary to test the land. Texas & Pacific Coal & Oil Co. v. Stuard, Tex.Civ.App., 269 S.W. 482; Kies v. Williams, 190 Ky. 596, 228 S.W. 40; Bradshaw v. Hurt, 198 Ky. 38, 247 S.W. 1113; Sugg v. Williams, 191 Ky. 188, 229 S.W. 72.

"This broad implied provision or covenant contemplates that, if oil is discovered

in paying quantities, or it reasonably appears to be there in paying quantities, the lessee will proceed with the operations and development so as to obtain full production in order that the lessor may receive his royalty. It likewise contemplates that the lessee will protect the premises against loss or drainage of the oil. Lawrence Oil Corporation v. Metcalfe, 241 Ky. 353, 43 S.W.2d 986.

"The reasonableness of the diligence and course of conduct with respect to the extent of the prosecution of the operations is to be measured by what would be done under the same or similar circumstances by operators of ordinary prudence and diligence having regard for the common rights and mutual advantages of both parties to the contract and not of the lessee or operator alone. Willis' Thornton on Oil & Gas, § 167; Rains v. Kentucky Oil Company, 200 Ky. 480, 255 S.W. 121; Austin v. Ohio Fuel Oil Company, 218 Ky. 310, 291 S.W. 386; Lawrence Oil Corporation v. Metcalfe, supra; Becker v. Submarine Oil Company, 55 Cal.App. 698, 204 P. 245; Strange v. Hicks, 78 Okl. 1, 188 P. 347; Jacob v. Stephenson, Tex.Civ. App., 254 S.W. 1117; R. E. Taylor Syndicate v. James, Tex.Civ.App., 243 S.W. 1105; Prince v. Standard Oil Company, 147 La. 283, 84 So. 657; Goodwin v. Standard Oil Company, 8 Cir., 290 F. 92; Jennings v. Southern Carbon Company, 73 W.Va. 215, 80 S.E. 368."

The good faith of the plaintiffs cannot be questioned from the proof offered by this record. They were undoubtedly in the best of faith. The plain facts are that they were engaged in a business, technical in its nature and in a highly competitive field, about which they knew little or nothing. The rule drawn from Warfield Natural Gas Company v. Allen et al., supra, recognizes not only good faith but "the sound discretion of a prudent operator."

There is little dispute as to the facts in this case and the application of the principle of law as the rule is laid down in Kentucky is not difficult. It is a common sense proposition. Common sense must certainly conclude that there was only a hope for Luttrell No. 1 after September, 1941. Recent authorities on the rule applicable in this case may be found as follows: Wilson v. Wilson, 280 Ky. 461, 133 S.W.2d 722; Martin v. Graf et al., 289 Ky. 272, 158 S.W.2d 637; Durbin et al. v. Osborne et al., 292 Ky. 464, 166 S.W.2d

841; Cawood et al. v. Hall Land & Mining Co. et al., 293 Ky. 23, 168 S.W.2d 366; Sauder v. Mid-Continent Petroleum Corp., 292 U.S. 272, 54 S.Ct. 671, 78 L.Ed. 1255, 93 A.L.R. 454.

The plaintiffs here take something of an inconsistent position. While they insist that Luttrell No. 1 was never completed and was not even completed at the time of the trial of this case, yet most of their proof is in explanation of or excuse why they did not begin to drill a second well on the leasehold. They say that they were prevented from going upon the leasehold by the actions of R. I. Luttrell, his wife, Clora Luttrell (present defendant), and their son, Ed Luttrell. It is true that they were enjoined in the state court from going upon the leasehold in November, 1941. This injunction proceeding, however, was dismissed in May, 1942, and there appears to be nothing that prevented them from drilling a second well after May 26, 1942, until the death of R. I. Luttrell in September, 1942. Apparently this period was clearly open to them, regardless of any circumstances that may have occurred after that. There was no objection from Mrs. Luttrell until November, 1942, and none from Ed Luttrell until March, 1944. The plaintiffs' witness, Parker, testified that he continued to pump the well until December, 1943, but never got any oil. Mrs. Luttrell testified that in November, 1942, she asked Parker to stop work on the leasehold until the plaintiffs came down to discuss the matter with her, but she says that she never did anything at any time to hinder or stop the plaintiffs from operating on the lease. She says that none of the plaintiffs ever came to see her to discuss the matter with her.

At all of these times in the spring, summer, and fall of 1942 the plaintiffs were engaged in trying to bring into production two old wells on the adjoining tracts of land which are identified in the proof as the Morrison and Johnson wells, and had no intention of going back upon the Luttrell tract until the completion of the Morrison and Johnson enterprises. The reason for their delay in returning to the Luttrell lease for the purpose of drilling a second well, according to their testimony, is that they had obtained permission from R. I. Luttrell on May 26, 1942, to finish the Johnson and Morrison wells first.

One of the plaintiffs, Sydenstricker, gave the following testimony:

"A. Well we had gone down to look at the machine; and Dr. Niles couldn't drive his car only so far, the roads were so bad, so we stayed in the car; and the rest of them went down to look at the machine. When they came back Mr. Luttrell was with them and Mr. Luttrell came up to me and said, 'I would like to talk with you', and I said, 'all right, Mr. Luttrell'. I called Mr. Lowther to come with me and we walked away from the others off to the side, and Mr. Luttrell said, he says to me, 'Mr. Sydenstricker, I believe you will do what you agreed to do.' And I said, 'Yes, I will.' Then he says, 'Now what are you going to do about the well?' 'Well, Mr. Luttrell', I says, 'we have drilled a well on this land and I think Mr. Johnson should have a well, and after Mr. Johnson's well is drilled I think Mr. Morrison should have a well.' And we talked the matter over and he said, 'That is all right.' Then he said 'Then will you drill a well for me?' And I said, 'Yes, we will.' And we came to an agreement. And then I said, 'Mr. Luttrell there is one thing I want you to do, and that is have that suit dismissed today.' I said, 'Will you do that?' He said, 'Yes'. Then he turned to Mr. Lowther and said, 'Mr. Lowther, when you go in to town you have that suit taken care of.'

"Q. And that suit subsequently was dismissed? A. Yes.

"Q. And after having made or reached that understanding with Mr. Luttrell, first to drill a well on the Johnson land, and then one on the Morrison, and then a second well on the Luttrell lease, what was done about drilling wells on the Johnson and Morrison leases? A. The first machine we bought, it took about three weeks to get that machine on the Johnson land; and by the time he got it there and got it set up and he got it on June 2d, and by the time he got it set up and started to drill it was on the 24th day of June.

"Mr. Finn: What year?

"Witness: 1942.

"Q. And was that well drilled on the Johnson lease? A. Yes.

"Q. And when was the Johnson well completed? A. About—sometime in September, I believe.

"Q. Well did you then move over on the Morrison land? A. Yes.

"Q. And did you drill a well on the Morrison land? A. Yes, sir.

"Q. And when was that completed? A. Late in the fall of 1942.

"Q. Well, what month? A. I think in November.

"Q. November 1942? A. Just offhand I would say November."

This was in effect a waiver of the requirement that a second well be drilled within 12 months of the completion of Luttrell No. 1 and a waiver of the payment of the rental as required by the lease.

If this evidence is competent, the plaintiffs' case will succeed. If it is incompetent, the relief asked must be denied and the complaint dismissed.

There is thus squarely presented a construction of Section 606, subsection 2 of the Kentucky Civil Code of Practice.

This section provides that no person shall testify for himself concerning any verbal statement of or any transaction with or any act done by one who is dead when the testimony is offered, except in actions for personal injury, death or damage to property by negligence or tortious acts. The words, "and except 'in actions for personal injury, death or damage to property by negligence or tortious acts,'" were added to subsection 2 of section 606 by an Amendment in 1932, Acts 1932, c. 59. If it can be said that the gravamen of the instant case is the trespass or tort, then this statement of the deceased Luttrell, as testified to by the witness, Sydenstricker would be competent. If the gravaman of the instant case is the contract or lease on which the plaintiffs must necessarily rely, then the evidence is not competent.

In the case of Browns, Bell & Cowgill v. Soper et al., 287 Ky. 17, 152 S.W.2d 278, 134 A.L.R. 1385, in referring to the case of Warfield Natural Gas Co. v. Clark's Adm'x, 257 Ky. 724, 79 S.W.2d 21, 97 A.L.R. 971, the court said if the gravaman of the action was the alleged tortious and negligent acts of the defendant the exception contained in subsection 2 applied, and that being true, the converse must also be true that where the gravaman of the offense is not a negligent or tortious act, the exception has no application. Gravaman is defined by Webster as the substantial cause of an action at law. Certainly the substantial cause of the action in the case at bar is the claim of the plaintiffs to their leasehold for the mineral rights by reason of the contract or lease on which they must assert their rights.

■ I cannot agree with the contention of counsel for the plaintiff that this action sounds in tort rather than in contract. While it is true that the action itself is to enjoin a trespass upon the alleged property rights of the plaintiffs, the basis of the claim to these property rights is the contract or lease on whose terms and conditions the plaintiffs must rely to sustain their claim to the alleged trespass. I do not believe upon reason or principle or any of the authorities which I have examined that it was the intention of the Legislature, by the amendment, to permit such evidence on actions such as this, where recovery must rest upon a contractual relationship between the parties, and I do not believe that such implication can be read into the opinion of Warfield Natural Gas Co. v. Clark's Adm'x, supra.

Such a construction would defeat the whole purpose of the original code provision. The question presented is whether or not the terms of the contract were waived, modified, or changed by Luttrell. Certainly his own statements in that connection would go directly to the contract and the attitude of the parties in complying with its terms. Statements made in contract actions are held to be incompetent because the deceased is not present to refute or rebut them. Luttrell's statement waiving certain requirements of the lease had nothing to do with the alleged trespass of Mrs. Luttrell and Jarvis, which took place long after his death. His statement dealt solely with the contract. It would seem to be an extremely forced conclusion to say that his statement pertained to the trespass rather than to the contract.

■ Competency of such evidence is not to be determined on the basis of the kind and character of relief sought but rather upon what the statement itself pertained to. If the question is approached from this angle it eliminates the confusion which seems to be springing up in connection with the construction of this code provision as amended. If the statement was made in connection with a wrongful act and addressed itself to some phase of tort, it seemingly is competent. If it addressed itself to the contract, to a construction of or a waiver or a consideration of its terms, the exception created by the amendment does not apply and the statement is incompetent.

To base the competency or incompetency of such evidence upon the form of action or nature of the relief sought would place within the power of the plaintiff the right to determine, at the time he prepared his complaint, whether certain evidence should or should not be admitted.

I have carefully examined all of the cases cited by plaintiffs' counsel and some others which I have found on the construction of this amendment. I find that all of these cases in which such evidence is admitted are actions for personal injury or wrongful death. In Warfield Natural Gas Co. v. Clark's Adm'x, supra, which is the principal case on which plaintiffs' counsel relies, the plaintiff had sued for death of her decedent because the defendant, the Gas Company, had wrongfully turned off the gas in violation of the terms of its contract as construed by the court and which resulted in the death of her decedent from the disease of pneumonia. While there was a contract between the Gas Company and its consumer to leave the gas on so long as the gas bill was paid, the gravaman of the action is tort rather than breach of contract. In other words it was an action for death by wrongful act, which could have been had even though there had been no contract.

Colston's Adm'r v. Cincinnati, N. O. & T. P. R. Co., 253 Ky. 512, 69 S.W.2d 1072, was an action growing out of the killing of plaintiff's decedent at a crossing of a public highway. The engineer was permitted to testify without objection concerning a transaction which he had with the decedent. There is no discussion of the code provision in the opinion, but it merely quotes the part added by the amendment and says that the evidence is competent since the engineer was himself a party defendant and the action was one for wrongful death.

Kinsella et al. v. Meyer's Adm'r, 267 Ky. 508, 102 S.W.2d 1117, was a death case where a policeman at Covington ran into and killed plaintiff's decedent. The defendant carried the deceased immediately after the accident, and before his death, to the hospital and was permitted to testify that after reaching the hospital the deceased stated to him that the accident was his own fault.

Hughes v. Bates, Adm'r, 278 Ky. 592, 129 S.W.2d 138, was an action for wrongful death. I am unable to see where any of the language in that opinion could have any possible application to this case.

784

The same is true of Melton's Adm'x v. Robinson et al. (Day's Adm'r v. Robinson) 270 Ky. 621, 110 S.W.2d 428, which was an action for damages for death from shooting.

All of these cases were for the recovery of damages for tortious acts or negligence. The nature of the remedy in the case at bar is more nearly akin to the common law action for replevin or ejectment or to the statutory remedy of claim and delivery. The actions for ejectment and replevin were in rem proceedings and yet they charged a trespass for which damages were recoverable.

The case of Williams et al. v. Waddell et al., 285 Ky. 416, 148 S.W.2d 298, was an ejectment action and it was held that the plaintiff could not testify as to statements made to him by his deceased father as to the true location of the boundary line of the property in controversy.

The Kentucky Court of Appeals has repeatedly held that the action for claim and delivery under our statute is but a substitute for the ancient common law action of replevin and that it is an action both in rem and in personam, in which the essential facts necessary to support the action were that a plaintiff must allege and show a general or special ownership in the property. Halcomb v. Phipps, 194 Ky. 648, 240 S.W. 363; Stimson's Ex'r v. Tharp, 284 Ky. 389, 144 S.W.2d 1031; Farmers & Depositors Bank v. Taylor, 290 Ky. 774, 162 S.W.2d 764.

Throughout the consideration of this case we must bear in mind the difference between the gravaman of the action and the nature of the remedy. Where the plaintiff seeks redress by an action in ejectment, replevin, or for claim and delivery, he is charging a trespass on his property which he holds or asserts title to under a contract.

The case of Slack v. Bryan, 299 Ky. 132, 184 S.W.2d 873, decided January 12, 1945, was a claim and delivery proceeding in which the plaintiff sought to recover the possession of certain personal property in which he alleged ownership. The property in question was a valuable diamond in the possession of his sister, who claimed to have inherited it from their mother. The plaintiff was barred from testifying as to any conversations or transactions with his deceased parents relative to his ownership of the stone. This case more nearly presents the question that is here for determination than any other my research has disclosed. The plaintiff in Slack v. Bryan was asserting ownership by reason of a gift of the diamond and the fact that he had loaned it to his mother and father. He was asking to recover possession of it by a claim and delivery proceeding which charged a trespass by his mother and sister who had and were asserting ownership in the property.

 I must conclude that all the transactions and conversations, both those which are quoted in this opinion and other instances which appear in the record (on all of which ruling was reserved until final submission), had with R. I. Luttrell are incompetent as evidence to be considered in this case.

In consequence of this ruling the plaintiffs' complaint should be dismissed.

Findings of fact, conclusions of law, and judgment are this day filed.