George N. LeBAR and Inexco Oil Company, a corporation, Appellants (Plaintiffs below),

v.

Robert L. HAYNIE et al., Appellees (Defendants below).

No. 4527.

Supreme Court of Wyoming.

Aug. 13, 1976.

Houston G. Williams of Wehrli & Williams, Casper, and Arthur S. Berner and Robert E. Gill, Jr., Houston, Tex., for appellants.

Morris R. Massey and William F. Drew of Brown, Drew, Apostolos, Barton & Massey, Casper, for appellees.

Before GUTHRIE, C. J., and Mc-CLINTOCK, RAPER, THOMAS and ROSE, JJ.

GUTHRIE, Chief Justice.

This appeal arises from a complaint filed by appellants, seeking from the lower court a declaratory judgment holding that an oil and gas lease dated June 28, 1968, under which appellees claim, was void and of no further force or effect and that three later oil and gas leases dated September 13, 1973, under which appellants claim, were valid and in full force and effect and that the lands covered thereby were free of any claims of appellees. The trial court found adversely to appellants, finding that the first lease was in full force and effect and that the three later leases were invalid and gave the lessees no right thereunder.

To establish a frame for this case, we shall make a most general and summary statement of the facts, fully cognizant that in the disposal of certain specific issues it will be necessary to engage in a more de-

tailed statement of the facts applicable to those propositions.

■ As in all cases upon an appeal, we shall throughout this opinion not consider or weigh conflicts in the evidence but shall recite the evidence as it appears most favorable to appellees, along with any inferences which spring therefrom, *Oedekoven v. Oedekoven,* Wyo., 538 P.2d 1292, 1297.

On June 28, 1968, Paul C. LeBar and his wife, Georgia C. LeBar, executed and delivered to Stoltz & Company an oil and gas lease[1] for a five-year primary term covering 2156.71 acres in Converse County, Wyoming.[2] Appellees claim under and by virtue of this lease and no question is raised that they are not the successors in interest to all rights thereunder.

On September 13, 1973, George LeBar executed and delivered to Inexco Oil Company three oil and gas leases covering the lands here in dispute. All of the leases were properly and seasonably recorded in the office of the county clerk in Converse County, Wyoming. Stoltz & Company paid the annual rental for the five-year period and Stoltz, Wagner, and Brown, successors to Stoltz & Company, made a sixth yearly rental payment to LeBar on March 9, 1973, but discovering their error wrote LeBar, asking that the rental payment be refunded and that they would supply a release of this lease. The money was refunded but no release was ever made. We are not confronted, however, with any claim that this effected the release of the Stoltz lease.

Haynie, who through some arrangement which is not clear in the record but which is not challenged, owned a substantial interest in the lease from the time Stoltz & Company obtained it. To protect his interest, on April 11, 1973, he wrote LeBar, advising him that he and Mayer had an interest in the lease and inquiring if they could obtain an extension or a new lease,

and offering a bonus for some arrangement. Haynie followed this up by asking for a reply but LeBar did not respond. The record indicates that from about 90 days prior to this expiration date both Haynie and Mayer engaged in negotiations with various oil firms and individuals and made considerable search for someone to assist in some financing agreement so that a well could be drilled on this lease. These were all unsuccessful, and no definite arrangement was made until June 27, when Haynie was able to interest the Chinook Pipeline Company, which made a commitment and agreement of financial support enabling the drilling of this well. During this period of negotiation Evinger, acting as an agent for Haynie and Mayer, proceeded with certain arrangements, including the staking of a location and a discussion with LeBar and Carl Hageman, who had some right to the surface of this location; and the parties agreed upon an amount to be paid for surface damage for the location, payment for a road right-of-way, and the installation of an auto gate. They agreed that this should be reduced to writing, which was done on June 27 in Mr. Hand's office. Appellees paid the agreed sum of $800 and installed an auto gate under the terms of this agreement. On June 26 Evinger filed an application for a drilling permit with the Oil and Gas Supervisor of the State of Wyoming for drilling a well upon these premises and received verbal approval, although written approval was not issued until July 10. Evinger also made arrangements for dirt work and the digging of a pit on June 25, and apparently made arrangements to secure water for drilling from a neighbor about this time. The original drilling permit set out a plan to drill through the Parkman Formation, or 8000 feet. Evinger also hired Ruby Drilling Company to move upon this location with a so-called water-well rig, which operation was begun before noon on June

1. This lease shall be referred to in this opinion as the Stoltz lease.

2. The description of these lands is immaterial to this decision and will not be included herein.

28. Ruby was advised that this was an expiring lease and they were to set surface pipe. That rig drilled a 7⅞-inch hole to a depth of 94 feet. On June 26 Mayer had made an arrangement with Lohmann and Johnson, who were owners of a large drilling rig, to move upon this location and to drill a well. Lohmann and Johnson moved the major component parts of this rig upon these premises by the evening of June 28. Upon the arrival of this rig the Ruby rig was removed from the hole, and after rigging up the Lohmann-Johnson rig enlarged the hole to 12¾ inches in diameter to a depth of 80 feet, and the following day drilled 318 feet in preparation for running the surface casing. These operations were continued with some difficulty, because of lost circulation, until the hole reached a depth of 6744 feet, and the Lohmann-Johnson rig remained on this hole until July 13, when a 5½-inch casing was run to a depth of 6719 feet. When this was completed the rig was released and removed from the location. There were further discussions among the appellees, looking to the testing of this well in the Lewis Formation. They then obtained the so-called Capshaw rig, but after the testing was completed and certain other procedures were taken, the Capshaw rig was removed from the location on August 2 because this rig was not properly equipped to drill to the Teapot Formation and would have to have been modified. During the period from the time of its removal until August 27 no active work was pursued because of the difficulty of obtaining another rig. At that time a completion rig owned by Sing Well Service Company was moved upon the well and various operations were conducted thereon, including the deepening of the well to 7115 feet. Discovery of commercial production having been made at that depth, the well was completed as a producer on October 2.

The terms of the Stoltz lease must govern our disposal, and the following provisions are applicable to this controversy:

"It is agreed that this lease shall remain in force for a term of ~~ten (10)~~ five years from this date, referred to as primary term and as long thereafter as oil, gas, casinghead gas, casinghead gasoline, or either of them is produced from said land, or from lands with which said land is pooled or operations are continued as hereinafter provided.

" * * * if the lessee shall commence to drill a well within the primary term of this lease on the land above described, * * * the lessee shall have the right to drill such well to completion with reasonable diligence and force with like effect as if such well had been completed within the primary term. * * *"

Appellants urge us to reverse the trial court for the following reasons:

   I.  Appellees did not commence a well during the primary term.

  II.  Even if the well were timely commenced, it was not drilled with reasonable diligence and dispatch.

 III.  The LeBar Number One well was completed as a dry hole and subsequently reentered to be deepened.

## COMMENCEMENT OF THE WELL

The trial court found:

"The language of the Stoltz lease, to the effect that the lease will remain in force for the five-year primary term 'and as long thereafter as oil, gas, casinghead gas, casinghead gasoline, or either of them, is produced from said land, . . . or operations are continued as hereinafter provided' refers to the situation in which drilling operations are in progress at the time at which the lease would otherwise expire. Such operations were in progress on the lease on June 28, 1973. Defendants did comply with the conditions of the Stoltz lease to extend it beyond its primary term. The evidence shows that defendants timely commenced operations with the good faith intention to proceed diligently with the work of drilling a well to completion and that their operations were thereafter conducted with reasonable diligence and

dispatch and did result in completion of a well capable of producing oil and gas in paying quantities."

This court has at least twice been confronted with a determination of the question whether an oil and gas lease has been extended beyond its primary term by preliminary actions or preparations of the lessee without actual drilling having been begun and has determined that under certain circumstances the lease may be extended, *Fast v. Whitney,* 26 Wyo. 433, 187 P. 192, 193; *True Oil Company v. Gibson,* Wyo., 392 P.2d 795, 796. In probable deference to these holdings, appellants assert no basic disagreement with the application of the rule that under and by terms of this lease the requirement of "commence to drill a well" may be satisfied if preliminary commencement activities are not mere pretenses or a holding device to retain possession of the lease; and if these acts are commenced and prosecuted with a good-faith and bona fide intention to drill and complete the well, and if these acts are performed with such intent and the party proceeds thereafter with diligence to the completion of the well, it will result in the extension of the primary term of the lease.

■ In prosecuting this appeal appellants now assert that their three grounds for reversal must be decided as questions of law and have by most skillful and adroit argument, under the guise of presenting them as questions of law, really extended this court an invitation to review the evidence and the findings and inferences of the trial court and to substitute our views for those of the fact finder. This is the basic theme of appellants' three contentions. The preliminary activities necessary to comply with the requirement of the commencement of a well were considered to be factual questions in both *Fast* and *True Oil.* Additionally, a careful examination of the authorities cited by appellants in connection with their first contention reveals that all the cases we consider applicable were determined as questions of fact

at the trial court level, and the appellate court in no case reversed the finding of a trial court. This is demonstrated clearly by the case of *Butler v. Nepple,* 54 Cal.2d 589, 6 Cal.Rptr. 767, 354 P.2d 239, upon which appellants have placed great reliance in support of their first two contentions. In sustaining the action of the trial court in that case they enunciated the rule at 243, which is controlling:

"In reviewing the evidence, all conflicts must be resolved in favor of the questioned findings and all reasonable inferences indulged in their support. * * *"

In face of the trial court's specific finding of this element, the appellants must be reduced to the contention that the evidence simply does not sustain this finding of good faith and bona fide intention of appellees to diligently proceed with the drilling of the well, and appellants ask us to find therefrom that appellees' real purpose was only to hold this lease. If there is substantial evidence we cannot do this, but must be bound by the finding of the trial court, *Caillier v. City of Newcastle,* Wyo., 423 P.2d 653, 656, and cases collected in 1 West's Wyoming Digest, Appeal and Error, ■ p. 402, et sequitur, and cases in 1976 Cum.P.P. Further, "Findings of fact must be construed liberally and favorably to the judgment," and the presumption is that they are right, *Jassman v. Wulfjen,* 71 Wyo. 261, 257 P.2d 334, 336; *Murphy v. Petrolane-Wyoming Gas ·Service,* Wyo., 468 P.2d 969, 979. This court has held further that where the finding by the trial court is not inconsistent with the evidence it will not be disturbed on appeal, *Wyoming Farm Bureau Mutual Insurance Company v. May,* Wyo., 434 P. 2d 507, 511.

■ In our view there was sufficient evidence for the court to make this finding from the facts which have been heretofore set out, and we thus cannot disturb the trial court's finding on this first issue no matter what might be our personal view.

## WELL DRILLED WITH REASONABLE DILIGENCE AND DISPATCH

Appellants' contention, that even if the well was timely commenced it was not drilled with reasonable diligence and dispatch, being a direct attack on the findings of the trial court, faces the same hurdle and burdens as mentioned in the *Jassman* and *Murphy* cases, supra, and the rule that the same will not be disturbed as set out in *Wyoming Farm Bureau Mutual Insurance Company v. May*, supra.

■ This court has heretofore observed that reasonable diligence in any particular instance "depends upon a variety of circumstances," and further suggested that these circumstances be considered in light of what would be reasonably expected by operators of ordinary prudence, *Phillips v. Hamilton*, 17 Wyo. 41, 95 P. 846, 849, which leaves the clear inference that diligence is a question of fact and intention which must be developed and decided in each case. Because of this court's recognition of the prudent-operator rule, we find the following statement most applicable and demonstrative that this is a factual question:

> "In cases questioning the development done by an operator under the prudent operator rule, the actions of the operator are examined item by item. This is essentially a comparison of his acts with standards or practices then prevailing in the area all in the context of economics. These items constitute fact questions and on appeal the findings made in such a suit must be treated accordingly. * * *" *Chenoweth v. Pan American Petroleum Corporation*, 10 Cir., 314 F.2d 63, 65–66.

We see the application of the rule that diligence is a factual question in *Whitaker v. Texaco, Inc.*, 10 Cir., 283 F.2d 169, 175. The case of *Foster v. Atlantic Refining Company*, 5 Cir., 329 F.2d 485, 493, involved a claim that the producer had failed to reasonably or diligently develop a producing horizon, but the court sustained the judgment of the trial court based upon a finding of fact, as in this case where the trial judge is the fact finder. Thus we cannot disturb the finding of the trial court as to the reasonableness and diligence of appellees, and appellants' second contention cannot stand.

## WELL COMPLETED AS A DRY HOLE

Appellants' last ground for reversal rests upon their assertion that they were able to demonstrate that the appellees had completed the well as a dry hole and did not intend at that time to drill further to the Teapot Formation; and that their continued operations were really a reentry and re-deepening of this once completed well after the lease had expired, contending as they do that the lease expired on July 13 when the casing was run and the Lohmann-Johnson rig was removed from the hole. They insist that the evidence is clear that appellees had no intention at that time to test the Teapot but elected to complete the well in the Lewis Horizon and release the rig, asserting in their brief that lessees "had no intention to drill further." These contentions demonstrate that even the appellants consider this a question of intent and state of mind, which again raises a factual question for determination by the trier of facts and that the rules set out earlier in this opinion in connection with factual findings do apply.

A "completed well" or "a completion" has many different meanings under various applications, 3 Kuntz, Oil and Gas, § 32.3, pp. 77–78 (1967), the thrust of appellants' argument being that "once the well was completed as a dry hole, the primary term had expired and lessees had no further right to drill or obtain production." This position, being based upon an assumption that the facts negative the intention to drill deeper, might normally be viewed as resulting in their admission that until the well was completed within the intention of the appellees the lease would remain in force. The various applications involving

the term "completed well" and the difficulty of applying general rules for this determination are quite well exemplified by the authorities cited by the appellants in this area and demonstrate the fact that in each case this determination is dependent upon the facts as they arise.

One of the cases cited by appellants in support of their position is that of *Niles v. Luttrell,* D.C.Ky., 61 F.Supp. 778. That case involved a question of whether a well had been completed in such manner that it tolled the necessity of making a rental payment or the drilling of another well. The well was begun in that case in January 1941 and was drilled to a depth of 815 feet, and never drilled to any greater depth. In June it was shot three times with nitroglycerin without result. Later in the summer, in August or September, the well was acidized and during that period and until later 1943–1944 various things were done to bring the well into production with a continuing attempt to produce it. The court in that case determined that under these circumstances the well was completed when it was acidized without result, and that the lessee should have paid the delay rental or should have begun drilling another well within one year, as provided in the lease. The factual distinctions making this case inapplicable are obvious. Paramount is that the well was never drilled any deeper; nor was any intention to drill the well deeper ever asserted—unlike in this case. There was only a continuing attempt to produce from the tested horizon, as in the cited case. The appellees in this case do not rely upon a completion in the tested sand (Lewis). The court in the Niles case said that the lessee had "done everything known to the art to bring the well into production," 61 F.Supp. at 780. The real question was whether this was a commercial well. The rationale of that opinion is based upon the obligation of the lessee to test and develop property in good faith and with reasonable diligence to secure production, and we find in the case of *Warfield Natural Gas Co. v. Allen,* 248 Ky. 646, 59 S.W.2d 534, 536, 91 A.L.R. 890, upon which reliance was made in the cited case, the following:

"* * * These implied obligations include that of exercising good faith and the sound discretion of a prudent operator to drill to a depth that is reasonably necessary to test the land. * * *"

This quotation should give the appellants little comfort as appellees did proceed to a depth which was reasonably necessary to test this land. The writer will remark that coincidentally he has been unable to find any reliance of any other court upon this case in determining what the term "completed well" means.

Appellants further rely upon the case of *Moore Oil v. Snakard,* D.C.Okl., 150 F. Supp. 250, which is clearly inapplicable, being based upon a finding by the court that operations had ceased upon the well. There is no direct finding that the well was a "completed well" but the basis of decison was that the lessee could hold the lease beyond the primary term if he proceeded in a prudent and diligent manner until he ceased such operations. There is no such finding of cessation in this case. If there is any suggested implication that this case is authority for the proposition that this was a completed well, it is totally inapplicable to our factual situation because it was never deepened, there was then no known method by which the well could have been deepened, and there was no evidence that the well could ever have been completed as a commercial producer. Normally the writer would have dismissed these cases with the statement they were inapplicable to our factual situation in this case, but they do demonstrate the correctness of *Kuntz,* supra, and clearly demonstrate that such determination is dependent upon the posture of the case, and more importantly that these cases are and were to be determined as factual situations, which again brings into operation the general rule which we have repeated earlier in this opinion.

The contention that this was a completed well upon the removal of the Lohmann-Johnson rig, after running the casing on July 13, would have prohibited the use of the Capshaw rig in testing the Lewis Formation and would have prevented appellees herein from a test of a potential horizon, which, had the formation been productive, would not have been in the public interest for a society that has a critical need for such energy sources; nor would it be consistent with the duty owed to the landowner to prudently develop these premises.

Although 96 days elapsed between the date upon which this well was commenced and its completion as a producer, the test of diligence may be different in "wildcat" or "unproven" areas, *Braun v. Mon-O-Co Oil Corporation,* 133 Mont. 101, 320 P.2d 366, 369–370. This was an unproven area and there was a possibility of production from four different horizons in this area,[3] and this writer believes that he may personally opine, without serious damage to the law, that prudence would always dictate testing of all possible productive horizons in unproven areas.

This writer confesses difficulty in finding any authority by way of definition which under the facts might be deemed directly applicable. However, the case of *Howard v. Hughes,* 294 Mich. 533, 293 N. W. 740, 743, has a helpful definition which we believe applicable hereto and which substantially defines a completed well as one drilled "to such depth as to penetrate to the oil and gas sand in that community, or to such depth that the absence of oil or gas precluded the probability of finding it at a further depth." A somewhat similar definition containing the same elements appears in *Smith v. Hayward,* 193 F.2d 198, 201, 39 CC Pa. 748, 92 U.S.P.Q. 126, and it is observed that under both these definitions this well was not completed until October 2, 1973. No real value would lie in an extended discussion of the evidence upon which the trial court based its find-ing, which we view as sufficient. However, illustrative of appellants' attack are some of the uncontroverted facts from which they insist we must draw a different inference than did the lower court.

Much importance is attached to the fact that on July 13 appellees secured from American Petrofino, with whom they had made an agreement to drill a well to the Parkman, or 7700 feet, an amendment of the original agreement; and Petrofino agreed that by drilling the well to the then depth of 6744 feet this would be accepted as performance of the agreement to drill to the Parkman, and that Petrofino would assign the acreage which they had agreed to contribute for such Parkman test. Standing alone, this might be strong evidence that the well was considered completed at the depth of 6744 feet. Taken upon the known factual background of the lost circulation problems, however, the necessity of running casing, and the fact there was a possibility of production in the Lewis Formation, which was still to be tested, we do not see that only one inference could be drawn, as proven production in the Lewis Formation would have tended to enhance the value of the remaining lands in this area. Contradicting this intention, which appellants consider so clear, is the physical fact that appellees did on this same date set casing 900 feet below the point necessary to test the Lewis. Although there is no evidence as to the additional value of this casing, or the expense required in running the same, it is obvious that had appellees not considered drilling the well deeper if the Lewis proved nonproductive, there was a waste of considerable time, material and effort, which should not be ignored.

It is our view, then, that the finding of the trial court must stand and that the well was not completed on July 13, and that this drilling was not merely a re-deepening of a completed or plugged well.

For the reasons set forth in this opinion, the judgment is affirmed.

---

3. Lewis, Teckla, Teapot, and Parkman.