**W. H. GILMORE, Appellant (Defendant below),**

v.

**OIL AND GAS CONSERVATION COMMISSION of the State of Wyoming, and Cities Service Company, Appellees (Plaintiffs below).**

**No. 5552.**

Supreme Court of Wyoming.

March 19, 1982.

Houston G. Williams, Richard L. Williams and Patricia M. Baird, of Williams, Porter, Day & Neville, P.C., Casper, for appellant.

Joe Scott, Sp. Asst. Atty. Gen., Casper, for appellee Wyoming Oil and Gas Conservation Commission.

Morris R. Massey of Brown, Drew, Apostolos, Massey & Sullivan, Casper, for appellee Cities Service Co.

Before ROSE, C. J., and RAPER, THOMAS, ROONEY and BROWN, JJ.

BROWN, Justice.

On July 1, 1980, the Wyoming Oil and Gas Conservation Commission (hereinafter referred to as Commission) entered its order approving a plan of unitization of the Hartzog draw field.[1] Appellant appeals the

---

1. "Unitization

"A term frequently used interchangeably with POOLING (q.v.) but more properly used to denominate the joint operation of all or some portion of a producing reservoir as distinguished from pooling, which term is used to describe the bringing together of small tracts sufficient for the granting of a well permit under applicable spacing rules.

"Pooling is important in the prevention of drilling of unnecessary and uneconomic wells, which will result in physical and economic waste. Unitization is important where there is separate ownership of portions of the rights in a common producing pool in order that it may be made economically feasible to engage in cycling, pressure maintenance or secondary recovery operations and to explore for minerals at considerable depth." 8 Williams & Meyers, Oil and Gas Law, Manual of Terms, pp. 800–801 (1981).

unitization plan approved by the Commission and its affirmance by the district court.

The issue on appeal urged by appellant is: "Were the findings of fact and conclusions of law entered by the Wyoming Oil and Gas Conservation Commission with regard to the protection of Appellant Gilmore's correlative rights supported by substantial evidence and in conformity with law?"

We will affirm.

The Hartzog draw field is located in Campbell and Johnson Counties, Wyoming. The field is about 18 miles long and from one to three miles wide, embracing approximately 31,065 acres. At the time of the hearing before the Commission on the application to unitize the field, there were 177 producing wells with working interest ownership held by more than 80 individuals or entities.

The Commission took an interest in the field in April 1977, initiated numerous hearings and required the operators to keep the Commission advised of progress in development, production and the nature of the reservoir in the field. Technical committees and subcommittees of operators and their representatives met numerous times. Hearings were held before the Commission pursuant to § 30–5–104(b), W.S.1977.[2] This provision of the law makes it the Commission's duty to investigate and determine whether waste exists or is imminent, or whether other facts justify or require action by the Commission. It eventually became apparent that reservoir pressure was falling to the bubble point.[3] The lower the pressure the more difficult it becomes to recover additional oil. The further the pressure falls below the bubble point, the less likely a successful secondary recovery operation can be accomplished.[4]

A technical committee of operators and their representatives concluded that reservoir pressure had fallen from an original pressure of 5,000 PSIG[5] to slightly below the bubble point of 1,500 PSIG as of January 1979. This committee recommended that the field be unitized as soon as possible. It was estimated that the contemplated secondary recovery operation would recover 30,525,000 barrels of oil. Evidence

2. Section 30–5–104(b), W.S.1977:
"The commission has authority and it is its duty to make investigations to determine whether waste exists or is imminent, or whether other facts exist, which justify or require action by it hereunder. The commission is authorized to enter orders following any investigatory hearings if properly noticed to operators, producers and processors under the provisions of the Wyoming Administrative Procedure Act [§§ 9–4–101 to 9–4–115] and the rules of the commission."

3. The pressure at which the oil begins to release gas from solution. 8 Williams & Meyers, Oil and Gas Law, Manual of Terms, p. 75 (1981).

4. "Secondary recovery.
"Broadly defined, this term includes all methods of oil extraction in which energy sources extrinsic to the reservoir are utilized in the extraction. One of the early methods was the application of vacuum to the well, thus 'sucking' more oil from the reservoir. The term is usually defined somewhat more narrowly as a method of recovery of hydrocarbons in which part of the energy employed to move the hydrocarbons through the reservoir is applied from extraneous sources by the injection of liquids or gases into the reservoir.
"Typically a differentiation is made between secondary recovery and pressure maintenance; the former involves an application of fluid injection when a reservoir is approaching or has reached the exhaustion of natural energy, while the latter involves an application of fluid injection early in the productive life of a reservoir when there has been little or no loss of natural reservoir energy. The fluid (water, gas or air) is injected into the formation through an input well and oil is removed from surrounding wells." 8 Williams & Meyers, Oil and Gas Law, Manual of Terms, p. 681 (1981).

5. PSIG (Pounds per square inch gauge).
"If pressure is measured relative to absolute zero, it is called absolute pressure; when measured relative to atmospheric pressure as a base, it is called gauge pressure. This is because practically all pressure gauges register zero when open to the atmosphere and hence measure the difference between the pressure of the fluid to which they are connected and that of the surrounding air." Robert L. Daugherty and Joseph Franzini, *Fluid Mechanics With Engineering Applications*, p. 28 (McGraw-Hill, 7th Ed. 1977).

before the Commission was that 1,800,000 barrels of oil would be wasted by a one-year delay in unitization and secondary recovery and 4,000,200 barrels by a two-year delay. In other words, 5,753.5 barrels of oil would be wasted each day that unitization and secondary recovery was delayed.

The Commission found that waste was occurring and would continue to occur by delaying secondary recovery, and as a result, after a November 13, 1979, hearing, ordered a curtailment of production pending unitization.

The operators held various meetings at which they voted on formulae to be used in allocating production under unitization. The 81 working interest owners considered a total of 71 formulae. Naturally, each of the owners wanted parameters favorable to them and wanted more weight to be given these parameters. After voting on almost 60 formulae, the owners were frustrated in their attempt to find one that would receive the statutory approval. As a result, they examined their voting records and used a computer to arrive at an equitable compromise formula that could receive the required approval. The resulting formula number 67 at issue here, received 75.89 percent approval. It appeared that no greater percentage would approve any formula proposed.

Section 30–5–110(f), W.S.1977, as amended, provides in pertinent part:

"No order of the commission authorizing the commencement of unit operations shall become effective until such plan of unitization has been signed or in writing ratified or approved by those persons who own at least eighty percent (80%) of the unit production or proceeds thereof that will be credited to royalty and overriding royalty interests which are free of costs, and unless both the plan of unitization and the operating plan, if any, have been signed, or in writing approved or ratified, by those persons who will be required to pay at least eighty percent (80%) of the cost of unit operations * * *. Any interested person may file an application with the commission requesting an order applicable only to the proposed unit area de-

scribed in the application which shall provide for the percentage of approval or ratification by either cost-free or cost-bearing interests, or both, to be reduced from eighty percent (80%) to seventy-five percent (75%). * * * If the commission finds that negotiations were being conducted on the effective date of this act or have been conducted for a period of at least nine (9) months prior to the filing of the application, that the applicant has participated in the negotiations diligently and in good faith, and that the percentage of approval or ratification required by this subsection cannot be obtained, the commission may reduce any percentage of approval or ratification required by this section from eighty percent (80%) to seventy-five percent (75%). * * * "

Cities Service Company, one of the interested parties, filed an application requesting an order reducing the percentage of working interest owners and royalty owners who must approve unitization from 80 to 75 percent and requested an order approving the proposed unitization plan. On July 1, 1980, the Commission approved a unitization plan based on formula 67 and reduced the required approval from 80 to 75 percent. Formula 67 allocated unitization production based on eleven parameters or factors of varying weight. Formula 67 allocated appellant about 1.2 percent of unitized production. This was his share of the 2.25248 percent of unitized production allocated to his tracts.

Formula 67, which was approved by the Commission, allocated unitization production based on eleven parameters or factors of varying weight:

| PARAMETER | WEIGHT |
|---|---|
| Usable Wells | 5.00% |
| First Six Months Production | 24.25% |
| Peak Rate | 2.50% |
| Wellbore Net Feet | 7.50% |
| Last Three Months Production Ending March 31, 1979 | 1.50% |
| Last Six Months Production Ending March 31, 1979 | 1.75% |
| Remaining Primary | 14.50% |
| Ultimate Primary | 12.25% |
| GLO (General Land Office) Developed Porosity Acre Feet | 5.75% |
| GLO Porosity Acre Feet | 12.25% |

Appellant complains that some parameters of this formula are unfair, specifically, the last three months and last six months production ending March 31, 1979. He further complains that he receives a net acreage shortage of 33.66 acres. Acreages used in the unitization plan were based on an 1880 survey of the General Land Office (GLO). All parties agree that there were some inaccuracies in this survey. Owners caused a more accurate resurvey to be made.

## I

■ Appellant appeals from the district court's review of a decision of the Wyoming Oil and Gas Conservation Commission. This Court has had occasion numerous times to indicate appellate rules for reviewing a decision of an administrative agency. Section 9-4-114(c), W.S.1977, as amended, provides:

"(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

"(i) Compel agency action unlawfully withheld or unreasonably delayed; and

"(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

"(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

"(B) Contrary to constitutional right, power, privilege or immunity;

"(C) In excess of statutory jurisdiction, authority or limitations, or lacking statutory right;

"(D) Without observance of procedure required by law; or

"(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute."

In *Board of Trustees of School District No. 4, Big Horn County v. Colwell*, Wyo., 611 P.2d 427, 428–429 (1980), we said:

"For the purpose of reviewing the propriety of the district court's action, we will review the agency action as though the appeal were directly to this court from the agency. We are governed by the same rules of review as was the district court. [Citations.]

"Therefore, we will not substitute our judgment for that of the agency. * * *

*    *    *    *    *    *

" * * * Under this standard [§ 9-4-114(c), W.S.1977, as amended], we do not examine the record only to determine if there is substantial evidence to support the Board's decision, but we must also examine the conflicting evidence to determine if the Board could reasonably have made its findings and order upon all of the evidence before it. * * * "

In this appeal we may not substitute our opinion as to the weight and credibility of the evidence for that of the Wyoming Oil and Gas Conservation Commission. In his statement of the issue, appellant claims the Commission's decision is contrary to law and not supported by substantial evidence. He does not allege it acted in excess of its jurisdiction, or that the Commission failed to follow the required procedures, or any other irregularity.

## II

■ The Commission made extensive findings, together with ultimate findings of fact and conclusions of law. The final finding of fact and conclusion of law states:

"10. The approval of the proposed unit is in the public interest, will substantially increase the ultimate recovery of hydrocarbons from the Shannon Sandstone Formation in the Hartzog Draw Unit, will assist in the prevention of waste, and will protect the correlative rights of all parties in interest within the Unit Area."

Appellant generally objects to the latter portion of Finding and Conclusion No. 10 that the unitization plan "will protect the correlative rights of all parties in interest within the unit area." More specifically, he objects to the Commission's finding that inaccuracies in the General Land Office survey would affect all working interests indiscriminately, and that the unitization formula gave appellant his fair, just and equitable share of the unit production. He also alleges that no findings were made with respect to his objection before the Commission that the last six months and last three months production parameters were not fair to him.

In his brief, appellant complains about the parameters of the last three and last six months production, but not about the parameter of the first six months production. His objections at hearing were not the same. When asked the nature of his objection, appellant stated:

"A. Well, two of our three tracts are larger than depicted on the GLO maps which were made back in, I believe, 1870. This map is highly inaccurate. And therefore, we do have more acreage than is shown in the parameters that are developed, that are used using the GLO maps. We take a pretty good beating there."

We are not sure just what production period appellant wants us to address, since he does not seem to contest the first six-month production period now, and since he did not protest the last three and last six-months periods below.[6]

All operators experience some downtime. All operators are naturally going to want their periods of peak production as parameters in the allocation formula or other favorable parameters. They will want more weight to be given to these parameters.

Though appellant does not complain that these parameters inaccurately reflect his production for the periods in question, he claims they should be updated. If this were done, the operators would probably never have achieved unitization. Some cutoff date had to be used. With over eighty working interest owners and 177 wells in the field, it would have been difficult, if not impossible, to find a period when someone would not have had excessive downtime.

If there was excessive downtime, it occurred in the first six months production interval, not the last three or six months. Regardless of when the downtime occurred, appellant presented no evidence to show how much downtime his wells experienced or how much production suffered because of it. Appellant's Exhibits 2–A, 2–B, and 2–C generally reflect an erratic production history for his three wells. The causes of the fluctuation are unknown. The Commission could easily have decided that it would be able to accept the first six months parameter without prejudice to appellant's correlative rights, even though the first six months production parameter accounts for 24.25 percent of the allocation. As to the last six and last three months parameters, even if they understated the potential of his wells, these parameters are weighted to account for a total of 3.25 percent of the total allocation. Their effect is insubstantial.

Decline curves and calculations shown by appellant have very little to do with the issues in this case. Appellant's Exhibit 1 is a comparison of nonunitized against unitized production. It tends to indicate that he would be better off by not unitizing. The same is shown by appellant's Exhibit 3, except that it does show a projected figure for the remaining primary oil that is higher than the projections of the unit engineer

---

6. In his brief appellant positively asserts that he did complain before the Commission about the parameters of the last three months and last six months production. He gives a citation where he claims he made this complaint. Apparently there was a typographical error, as there was no such page in the record. We have searched the record and found what we think appellant was trying to refer us to; how-

ever, he does not mention these parameters. He complains about a mechanical problem with the first six months parameters, decline curves and inaccuracy of the survey map. If appellant complained about the last three months and the last six months parameters elsewhere in the hearing before the Commission, his objection was so obscure that it was not detected.

committee. This is a factual issue which the Commission resolved; however, when appellant's attorney was asked the basis of his objection at the June 3, 1980, hearing he stated that the objection was very simple— appellant's correlative rights were being violated. Appellant had no "present objection to unitization as such." [7]

In support of appellant's primary disagreement with the action of the Commission, he refers to *Pattie v. Oil and Gas Conservation Commission*, 145 Mont. 531, 402 P.2d 596 (1965), to the effect that the prevention of waste cannot be at the expense of correlative rights of an owner in a unit. In that case Montana law did not define correlative rights, and the Montana Oil and Gas Commission did not believe that it could consider correlative rights in unitization. The Montana Court disagreed by saying that the Commission did not consider the correlative rights but held that it should have. *Pattie v. Oil and Gas Conservation Commission*, supra, 402 P.2d at 600. In the case here the Commission did consider correlative rights, limited by the practicalities of the situation and the ability to reduce waste.

Appellant also relies on *Bernstein v. Bush*, 29 Cal.2d 773, 177 P.2d 913 (1947), to support his position that prevention of waste cannot be at the expense of correlative rights. The case involves spacing and has minimal relevance here. California had a statute that prohibited the drilling of wells in certain areas, which prevented Bernstein from drilling an offset well to prevent drainage from a nearby well. The California court held that since the law did not give Bernstein an adequate means of protection as a substitute for the right to drill, he was denied equal protection of the law, and the denial of a permit to drill for oil and gas was a taking of private property without due process of law. Apparently the holding is another way of recognizing correlative rights, with which we agree.

We also agree with other states that have recognized that correlative rights and a right to produce oil from a pool are limited by a duty not to injure the pool and cause waste.

" * * * The right of an individual owner to take oil and gas from the reservoir in lawful operations is *limited* only by a *duty* to other owners (1) not to injure the source of supply and (2) not to take a disproportionate part of the oil and gas." (Emphasis added.) *Dodds v. Ward*, Okla., 418 P.2d 629, 632 (1966).

" ' " * * * [t]hat each owner or producer in a common source of supply is privileged to produce therefrom only in such manner or amount as not to injure the reservoir to the detriment of others or to take an undue proportion of the oil or gas obtainable therefrom, or to cause undue drainage between developed leases." ' " *Republic Natural Gas Co. v. State Corporation Commission*, 173 Kan. 172, 244 P.2d 1196, 1201 (1952).

A Texas appellate court ruled:

" * * * If, therefore, greater waste be caused to the other 36 wells in the field by permitting the 4 to produce in such manner as to minimize waste in the 4 particular wells, than would result from limiting all wells to a uniform producing pattern, though in doing so some waste be caused as to the 4 particular wells, then the order must be sustained as a conservation measure. * * * " *Railroad Commission of Texas v. Fain*, Tex.Civ. App., 161 S.W.2d 498, 500 (1942).

A Mississippi court said:

" * * * [W]e do not think it would be fair or equitable to permit a very small minority of small fractional owners in this common source of supply of hydrocarbons to prevent the Board and the overwhelming majority of the operating and royalty owners from pursuing a unitization program designed to obtain a maximum recovery from the field. * * * " *Corley v.*

---

7. Wyoming has a statute, § 30–5–101(a)(ix), W.S.1977, defining correlative rights.

" 'Correlative rights' shall mean the opportunity afforded the owner of each property in a

pool to produce, so far as it is reasonably practicable to do so without waste, his just and equitable share of the oil or gas, or both, in the pool."

*Mississippi State Oil and Gas Board,* 234 Miss. 199, 105 So.2d 633, 641 (1958).

Waste of oil and gas in the State of Wyoming is prohibited by law.[8] The Commission is charged by statute to make investigations to determine whether waste exists or is imminent, and to execute necessary orders dictated by its investigation. See footnote 2, supra. The Commission also has a duty to protect correlative rights.[9]

■ Appellant concedes that unit operation "was probably the most effective which the Commission had available to it," to prevent waste. He contends that in preventing waste his correlative rights cannot be ignored. We agree, but hold that substantial waste cannot be countenanced by a slavish devotion to correlative rights. We are faced with a delicate balancing problem between prevention of waste and correlative rights, but prevention of waste is of primary importance.

The right to produce one's fair share from the pool is limited by and subject to the practicalities of the situation and the ability to produce without waste. Other owners have a concomitant right to produce from the pool without waste.

In *Denver Producing & Refining Co. v. State,* 199 Okla. 171, 184 P.2d 961, 964 (1947), the Oklahoma Supreme Court considered the problem of preventing waste and finding a fair allocation formula. It stated the following:

"It will thus be seen (from the foregoing authorities) that the application of conservation measures necessarily results in curtailment of production of oil, gas or both in order to prevent waste and to obtain the greatest ultimate recovery from the pool. Experience has taught us that the heedless dissipation of gas reservoir energy of oil pools has resulted in the loss of many millions of barrels of oil. We take judicial knowledge of this fact. In most instances it is impossible to use a formula which will apply equally to all persons producing from a common source. In striking a balance between conservation of natural resources and protection of correlative rights, the latter is secondary and must yield to a reasonable exercise of the former. * * * "

What was said in 1947 about conservation of natural resources is even more significant now, considering increased demand for

8. Section 30–5–102, W.S.1977:

"(a) The waste of oil and gas or either of them in the state of Wyoming as in this act defined is hereby prohibited.

"(b) Whenever in order to prevent waste the commission limits the total amount of oil and gas which may be produced in any pool in this state to an amount less than that amount which the pool could produce if no restriction was imposed, the commission shall allocate or distribute the allowable production among the several wells or producing properties in the pool on a reasonable basis, preventing or minimizing reasonably avoidable drainage from each developed area not equalized by counter-drainage, so that each property will have the opportunity to produce or to receive its just and equitable share, subject to the reasonable necessities for the prevention of waste."

Waste is defined in § 30–5–101(a)(i), W.S.1977, as:

"(B) The inefficient, excessive or improper use, or the unnecessary dissipation of, reservoir energy;

*       *       *       *       *       *

"(D) The locating, drilling, equipping, operating, or producing of any oil or gas well in a manner that causes, or tends to cause, reduc-

tion in the quantity of oil or gas ultimately recoverable from a pool under prudent and proper operations, or that causes or tends to cause unnecessary or excessive surface loss or destruction of oil or gas;"

9. Section 30–5–110(e), W.S.1977, provides:

"If after considering the application and hearing the evidence offered in connection therewith, the commission shall enter an order setting forth the following described findings and approving the proposed plan of unitization and proposed operating plan, if any, if the commission finds that:

*       *       *       *       *       *

"(ii) Such unit operation is feasible, will prevent waste, will protect correlative rights, and can reasonably be expected to increase substantially the ultimate recovery of oil or gas * * *;

*       *       *       *       *       *

"(iv) The oil and gas allocated to each separately owned tract within the unit area under the proposed plan of unitization represents, so far as can be practically determined, each such tract's just and equitable share of the oil or gas in the unit area;"

oil and gas, increased foreign imports, and diminishing proven domestic reserves. There is a great public interest in the prevention of waste.

Here the Commission strived mightily to strike an equitable balance between correlative rights and prevention of waste. We agree with the Commission's acting Chairman, "And when that public interest conflicts with the private interest, the public interest has to come first."

### III

█ Fairness of an allocation formula is essentially a matter of first impression in this Court. There is a dearth of case law on the precise problem.

In *Humble Oil & Refining Co. v. Welborn*, 216 Miss. 180, 62 So.2d 211 (1953), the Mississippi Supreme Court upheld the action of the State Oil and Gas Board which approved an allocation formula based solely on acreage, in spite of one party's contention that the oil producing sands under his land were thicker and contained more hydrocarbons than adjoining lands. In *State Oil and Gas Board v. Seamans Paper Company*, 285 Ala. 725, 235 So.2d 860 (1970), the Alabama Supreme Court upheld an allocation formula that gave two-thirds weight to productive acre feet and one-third weight to production for the last six months. In *Woody v. State Corporation Commission*, Okla., 265 P.2d 1102 (1954), the Oklahoma Supreme Court upheld an allocation formula based one-half on acreage and one-half on saturated hydrocarbon pore space. One and two factor allocation formulae are fairly common. The eleven factor formula used here is fairer because it diminishes the loss caused by coming up a little short on one factor, as appellant did on GLO porosity acre feet. Coming up short on one of eleven parameters is much less drastic than coming up short on one if there are only two or three parameters.

There is no indication that a more equitable formula could be devised. After three years, formula number 67 appeared to be the fairest that could receive the necessary approval. The operator's technical committee and the Commission, both having experience and expertise at unitization, settled the formula 67 as the fairest and most feasible. Appellant did not suggest a better formula to the Commission, the district court, or to us. It would appear, therefore, that there is little chance that anyone involved could devise a better formula, nor is it likely that a different formula could receive the necessary approval.

As previously explained, a unitization plan must have the voluntary consent of at least 75 percent of the royalty owners and the working interest owners in the proposed unit area before the Commission will consider approving the plan. The United States owns 61.84 percent of the royalty interests in the unit area, and has an effective veto power over the proposed plan of unitization.

Officials of the United States Geological Survey, which administers oil and gas operations on federal lands, represented the United States at the hearing. These representatives stated unequivocally that to obtain the United States' approval of the unit plan, the plan would have to be based on the latest official survey. The requirement was mandatory, regardless of whether a retracement survey which had been made by the working interest owners was more accurate. All agree that the latest GLO survey made in 1880 was somewhat inaccurate; however, there is nothing in the record to suggest any ulterior motive on the part of the United States Geological Survey or to suggest that the government would receive a greater allocation because of the 1880 survey. The inaccurate 1880 survey affected owners indiscriminately.

Two of the parameters of formula 67, namely, "GLO Developed Porosity Acre Feet" and "GLO Porosity Acre Feet," are derived by obtaining the product of the surface acres in a tract and the thickness of the productive sand under the tract. Because of the inaccurate 1880 survey, appellant is 33.66 acres short. The combined weight of these two parameters in Formula 67 is 18 percent. Appellant might have more to complain about if acreage were the

only consideration or if acreage was weighted heavier in the formula. Had the retracement survey been used to calculate the surface area of appellant's tracts, evidence introduced by appellant indicates that his tracts would have been allocated an additional one-tenth of one percent of the total porosity acre feet in the unit area. If we accept these data as accurate, we see that appellant has demonstrated that his interests would be allocated an additional 5,494 barrels of oil over the life of the unit (30,-523,000 barrels of ultimate secondary production x .001% x 18%). Looking at this another way, appellant's shortfall under the unitization formula is about the same as the daily loss to the pool if there was no unitization.

The fact that a retracement survey shows appellant's tracts to be slightly larger than indicated by the official government survey, with the result that appellant would receive approximately 5,500 barrels of additional oil over the life of the unit, does not weigh heavily when the real question was whether the field would be unitized.

Appellant acknowledges he will receive 321,622 barrels of the additional oil from secondary recovery, which is 321,622 barrels more than he would receive if the field were not unitized. The Commission was certainly under no obligation, and is indeed prohibited from favoring appellant by arbitrarily insisting (if it could) that the retracement survey be used for calculating the porosity acre feet of appellant's tracts, but not for calculating the same parameters with respect to all other tracts.

Appellant's position has not been consistent throughout the history of this unitization plan. Appellant, by offering to lease the lands or by participating in a competitive bid, in effect relied on the survey of the lands by the United States 1880 GLO survey. He accepted the leases, which were subject to the regulations and requirements which might be imposed by the United States Geological Survey. When the unitization plan was proposed, however, appellant tried to avoid the survey. Initially, appellant opposed unitization and much of his evidence before the Commission was in support of that position. Later he took the position that he did not oppose unitization as such; and in fact, conceded that unit production "was probably the most effective which the Commission had available to it," to prevent waste.

At the hearing before the Commission appellant stated that the minimum allocation he would accept was 1.33 percent; earlier, however, he had voted for eight formulae that gave him less than 1.33 percent. He voted for one formula that gave him 1.1 percent.

We do not understand what appellant expects to accomplish by his lawsuit except perhaps force a settlement advantageous to him someplace along the line. A reversal here would not give appellant a larger share of the allocation, but would send the case back to the Commission with a mandate to come up with another formula. We do not believe that even appellant has any real expectation of a different formula that would receive the required approval. If a new formula were found and agreed upon, it could spawn new lawsuits. The specter of veto by the United States Geological Survey would not disappear. It is a fact of life which we cannot ignore.

The owners and technical committees worked for three years, trying to develop a formula that would get the necessary approval. As appellant says, "All operators worked long and hard, in good faith, to attempt to get a satisfactory unit agreement." The matter became so complicated that a computer was used to attempt a solution. Further, the Commission used its expertise in an effort to arrive at a satisfactory formula, and the owners and operators used their expertise. The group effort at compromise should not be discarded because of appellant's general disagreement with the plan. Appellant seems to expect perfection. Justice was accomplished here, as much as could be under the circumstances. This litigation should end.

Affirmed.