**The MAJORITY OF the WORKING INTEREST OWNERS IN the BUCK DRAW FIELD AREA: Diamond Shamrock Exploration Company, Woods Petroleum Corporation, Chorney Oil Company, Cities Service Oil and Gas Corporation, W.A. Moncrief, Jr., Apache Corporation, Ep Operating Company by Enserch Exploration, Inc., Managing General Partner, First Energy Corporation, Petitioners,**

v.

**WYOMING OIL AND GAS CONSERVATION COMMISSION, Respondent,**

**Kerr-McGee Corporation, Marathon Oil Company and Louisiana Land and Exploration Company, Intervenors.**

No. 85–287.

Supreme Court of Wyoming.

July 1, 1986.

Marilyn S. Kite, (argued) of Holland & Hart, Cheyenne, and Michael J. Brennan of Holland & Hart, Denver, Colo., for Majority Working Interest Owners.

Neil J. Short, (argued) of Ross & Short, Casper, for Diamond Shamrock Exploration Co.

Joe Scott, Sp. Asst. Atty. Gen., for respondent.

Houston G. Williams and George M. Porter of Williams, Porter, Day & Neville, Casper, Robert A. Miller, (argued) of Crabtree & Miller, Oklahoma City, Okl., and Delvin Menge of Marathon Oil Co., Casper, for intervenors Kerr-McGee Corp. and Marathon Oil Co.

S. Thomas Throne, (argued) Sheridan, for intervenor La. Land and Exploration Co.

Before THOMAS, C.J., and BROWN, CARDINE, URBIGKIT and MACY, JJ.

CARDINE, Justice.

After an administrative proceeding, the Wyoming Oil and Gas Conservation Commission (commission) ordered that the interest owners shut-in their oil wells in the Buck Draw North Oil and Gas Field until they agreed upon a unitization plan for secondary recovery operations. A majority of the working interest owners filed a petition for review in the district court, and the case was certified directly to this court. Several of the working interest owners, Kerr-McGee Corporation (Kerr-McGee), Marathon Oil Company (Marathon), and Louisiana Land and Exploration Company (LL & E), support the commission's decision and have intervened. We must decide whether evidence considered by the commission was properly before it, whether

substantial evidence supported the commission's finding that further primary production would cause waste, and whether the conditional shut-in amounted to an improper forced unitization.

We affirm.

### Facts

The Buck Draw North Oil and Gas Field was discovered by LL & E in 1983. LL & E and other interest owners developed the field quite rapidly, and there is presently at least one producing oil well on each 640-acre drilling unit. The initial reservoir pressure of the field, 8,100 pounds per square inch (psi), has diminished as production has occurred.

In January of 1985 the commission, on its own motion, called a hearing to review data on the field's diminishing pressure. The commission and some of the interest owners were concerned that the field's pressure would drop below the bubble point [1] of 4,665 psi, making secondary recovery operations difficult. [2] On January 8, 1985, the commission issued an order restricting production so that the reservoir's pressure would remain above the bubble point. The commission also ordered the owners to conduct a pressure survey, submit the data as soon as possible, and appear at the commission's April meeting to report on the feasibility of unitization and secondary recovery.

Prior to the commission's order, the owners had formed a technical committee to determine the best methods of developing the field. The committee continued its work throughout the spring of 1985 and hired an independent consulting firm, Jerry R. Bergeson & Associates, Inc. (Bergeson), to study secondary recovery possibilities.

The committee's work was not completed in time for the April hearing; so, at that hearing, the commission and the owners agreed to maintain the restrictions on production pending completion of the study. The commission issued an order to that effect.

After the April hearing, the technical committee received a preliminary Bergeson study based on data from a small part of the reservoir. The technical committee used this preliminary study for a model study to determine the technical and economic feasibility of secondary recovery. The committee concluded that a water-flooding operation would cause a significant loss of primary reserves if commenced while the reservoir pressure was above the bubble point. It recommended that unlimited primary production be resumed and that secondary recovery be studied further only after the pressure fell below the bubble point.

A majority of the owners accepted the committee's recommendation, but Kerr-McGee, LL & E and Marathon disagreed. They favored a more extensive study of secondary recovery before the reservoir pressure fell below the bubble point. LL & E conducted an in-house study of the water-flood method of secondary recovery while Kerr-McGee retained Bergeson to study the miscible-gas-flood method.

On August 13, 1985, the commission held its main hearing to decide how the North Buck Draw Field should be further developed. The majority, which favored resuming unlimited primary production of oil, called four witnesses. Dr. Phil Schenewerk, a petroleum engineer for Ensearch Exploration Company, told the commission

---

**1.** The bubble point is "[t]he pressure at which the oil begins to release gas from solution." *Gilmore v. Oil and Gas Conservation Commission,* Wyo., 642 P.2d 773, 774 n. 3 (1982) (citing 8 Williams & Meyers, Oil and Gas Law, Manual of Terms 75 (1981)).

**2.** " 'Secondary Recovery.

" 'Broadly defined, this term includes all methods of oil extraction in which energy sources extrinsic to the reservoir are utilized in the extraction. * * * The term is usually defined somewhat more narrowly as a method of recovery of hydrocarbons in which part of the energy employed to move the hydrocarbons through the reservoir is applied from extraneous sources by the injection of liquids or gases into the reservoir.' " *Gilmore v. Oil and Gas Conservation Commission,* supra, 642 P.2d at 774 n. 4 (quoting 8 Williams & Meyers, Oil and Gas Law, Manual of Terms 681 (1981)).

of the technical committee's findings. He testified that there would be a significant loss of primary reserves if secondary recovery was begun with the field pressure above the bubble point. This opinion was supported by Robert Scott, an exploration manager for Chorney Oil Company, and Steve Mastovich, a Diamond Shamrock Corporation geologist. They presented testimony, data and exhibits which indicated that the oil-bearing formation could not be successfully flooded with water or gas because it was discontinuous and fractured. The water or gas would move through the fractures and bypass the portions of the formation where the oil was located. According to Bruce Heath, supervisor of improved recovery for Woods Petroleum Corporation and the majority's fourth witness, it would be uneconomic to continue producing after an unsuccessful flood attempt because only the fluid used in the flood would be produced. The remaining oil that could have been produced under primary production would be trapped in place and lost.

Mr. Heath testified that it would be better to wait until reservoir pressure dropped below the bubble point before beginning any secondary operations. Primary production would then be safely completed and data would be available to analyze the prospects for secondary recovery. Mr. Heath stated that a risky immediate water flood would produce 3,713,000 barrels of oil equivalent while a safe water flood begun below the bubble point would produce only a little less, 3,397,000 barrels. According to Mr. Heath's most optimistic projection, an immediate miscible gas flood would produce a 14.65 percent rate of return on investment, too little to justify the risks involved.

The three witnesses called by Kerr-McGee and LL & E based their testimony on the additional studies they had conducted after the technical committee decided that it would rely upon the preliminary Bergeson study. Unlike the technical committee's studies, these studies were based on data from the entire field. These witnesses disputed all of the important conclusions drawn by the majority's witnesses.

Robert Chebul, an LL & E production manager, stated that the North Buck Draw Field was a candidate for secondary recovery because it was continuous. That opinion was corroborated by Mr. Connie Hawkins, a senior geologist for LL & E who described the geologic origin of the formation and explained in great detail why he concluded that the formation was continuous and not highly fractured. David Kimes, a Kerr-McGee reservoir engineer, also testified that the formation was continuous and therefore a likely candidate for secondary recovery by either miscible gas flooding or water flooding.

Both Mr. Chebul and Mr. Kimes testified that secondary operations would succeed only if begun above the bubble point. Mr. Chebul explained how a water flood would be impaired below the bubble point:

"[W]hen you draw the pressure down below bubble point [the] gas breaks out of * * * solution in the oil and creates a gas saturation in the reservoir which wasn't existing above the bubble point. "Once that gas saturation has been established in the reservoir, any subsequent attempt to inject waters into the reservoir, the injected water will take the path of least resistance and it will preferentially flood through those zones where that gas saturation has been created, thereby bypassing the parts of the reservoir where the oil saturation still exists."

Mr. Kimes offered a similar scenario for the miscible gas flood if the bubble point was passed.

None of the minority witnesses thought that secondary operations above the bubble point posed much risk. They pointed out that the formation would not be damaged during a water flood because it contained only a small amount of clay which could disperse within the formation and obstruct the flow of oil. Mr. Kimes stated that there were too few fractures to interfere with a miscible gas flood.

Finally, the minority witnesses testified that secondary recovery was economically

feasible if begun above the bubble point. Under LL & E's water-flood model, 15 million barrels of oil (MMBO) and 33 billion cubic feet (BCF) of gas would be produced. This would amount to 19 million barrels of oil equivalent (MMBOE).[3] But continued primary operations would produce only 13.8 MMBOE consisting of 6.6 MMBO and 58 BCF of gas. In essence, the water flood would favor oil production over gas production while unabated primary production would essentially make Buck Draw North into a gas field. Mr. Chebul testified that he had contacted a likely gas buyer, Phillips Petroleum, and had been informed that Phillips would not be able to handle all the gas that would be produced from Buck Draw North under primary production.

Mr. Chebul concluded his testimony by analyzing the waterflood operation in terms of dollars. He said the additional production of 5.2 MMBOE from water flooding would be worth $135 million to the owners and $22.5 million to the state through taxes. Of course, the owners would incur additional costs for the water flood; and Mr. Chebul presented the commission with various calculations of the rate of return on this investment. If the water flood cost $25 million and took two years to implement, the rate of return would be 16 percent. If the water flood could be achieved more quickly, the rate of return could be as high as 37 percent.

Mr. Kimes described the results of the miscible gas flood model which Bergeson prepared for Kerr-McGee. He testified that a gas flood would produce 13.4 million barrels of oil which would never be produced through primary production methods. He presented a graph which showed that the miscible gas flood would not diminish the amount of gas ultimately recovered. In other words, the increased oil production would represent a net gain from the field. Mr. Kimes supported these figures by introducing, as an exhibit, a summary of the

study which had been prepared by Bergeson.[4]

Mr. Kimes estimated that at $26 per barrel—the price of oil at the time of the hearing—the additional oil would be worth $348 million; and the rate of return for the gas flood, after income taxes, would be between 20 and 40 percent. He admitted that these estimates were not yet fully supported by hard data because the full Bergeson study was not quite finished. He assured the commission and the parties that as soon as the Bergeson data was available, Kerr-McGee would apply it to an economic model and produce firm figures on the rate of return from a miscible gas flood.

At the conclusion of Mr. Kimes' testimony, the commission accepted brief written and oral statements from other interested parties. These statements were in the nature of opinion, and none of the parties chose to cross-examine. After these comments, the hearing came to a close.

Throughout the hearing many studies were discussed, and the parties were not always able to effectively respond to them because they had not been made available to all. The parties and the commission agreed that several of the studies, including the full Bergeson study, LL & E's water-flood model, and Kerr-McGee's economic data, should be made available to the majority interest owners after the hearing. Woods Petroleum Corporation of the majority group was also expected to give a water-flood study that it performed to Kerr-McGee and LL & E. On August 16th, several days after the hearing, the commission published an order in which it created a procedure for supplementing the record. After listing the studies that had been discussed at the hearing, the order stated:

"These studies and reports should be made available to the Commission staff and the parties. * * * This exchange of information should be completed no later

---

**3.** Oil equivalent is reached by multiplying the amount of gas produced by a ratio of current oil and gas prices.

**4.** Bergeson sent the full study to Kerr-McGee on August 29, 1985, and it was added to the record and distributed to the parties in early September.

than September 9, 1985. The Commission staff will then have until October 8, 1985, to make a recommendation to the Commission on the matter."

The order did not say when the record would be closed, whether a party could rebut the additional material, or whether further statements by interested parties would be accepted.

On September 6th the parties exchanged the full Bergeson report, Kerr-McGee's economic model, LL & E's water-flood model, and the Woods Petroleum study. The record was not closed with the receipt of this additional material. Numerous letters, rebuttals and complaints from both sides were filed with the commission between September 6th and the commission's decision on October 10th. Even the Bureau of Land Management (BLM), which did not make a statement at the August 13th hearing, took advantage of the open record. On September 30th, the BLM sent a letter to the commission in which it pointed out the various disagreements between the primary parties and suggested that the wells be shut-in pending further study.

Before the record closed, lawyers for the majority interest owners and Kerr-McGee submitted written closing arguments to the commission. The majority's closing was limited to argument, but Kerr-McGee's closing included ten factual exhibits. One of those exhibits was a new economic model run [5] which predicted a 29.7 percent rate of return for a miscible gas recovery operation. Unlike Kerr-McGee's original calculation of a 40 percent return, this model run showed a 29.7 percent rate of return because one of the assumptions was changed to make the secondary operation more costly. Kerr-McGee apparently submitted this final model run in response to criticism leveled at its earlier model run by South-

land Royalty Company, one of the majority interest owners. Southland had submitted its criticism to the commission on September 20th, two weeks after the data exchange of September 6th.

The commission published its decision on October 10, 1985.[6] The commission made the following important findings of fact:

1. The North Buck Draw Field is "in pressure communication within the subject lands."

2. Continued production, even though restricted, would cause the field to fall below the bubble point within three to six months.

3. "Maximum oil recovery is achieved when secondary or tertiary recovery operations are initiated above the bubble point pressure."

4. "If miscible gasflood operations are initiated above the bubble point pressure, approximately [13,400,000 barrels of oil] are recoverable in addition to those reserves recovered by primary means. Waterflood operations commenced above the bubble point would result in the incremental recovery of about seven million barrels of oil."

5. "The economics and feasibility of waterflooding or gasflooding are highly dependent on the timing of such operations. The proponents do not agree among themselves as to which method is better. The Commission must take economics into consideration; however, the Commission will not be placed in the position of determining what type of enhanced recovery should be initiated or when. Thus, the Commission's primary charge for the prevention of hydrocarbon waste is first and foremost. The waste of up to 13,400,000 barrels of oil must be prevented. Also, allowing the formation pressure to fall below the bubble point

---

5. A model run is the application of a computer model to a set of variables. The model we are discussing here is designed to predict the rate of return on investment for secondary operations.

6. In its brief, the commission claims that it held a perfunctory hearing on October 10th before announcing its decision. The commission

claims that at that hearing the parties waived any procedural problems created by the commission's acceptance of evidence after the exchange of data on September 6th. We cannot find that transcript in the record and, therefore, cannot consider the commission's waiver argument based on the details of that hearing.

pressure constitutes inefficient use of and unnecessary dissipation of reservoir energy."

6. "Liberation of the gas in the reservoir below the bubble point would change the producing characteristic from that of an oil reservoir to that of a gas reservoir * * *. Such gas production in a time of gas oversupply is a less efficient use of reservoir energy than if the reservoir is maintained above the bubble point as a volatile oil reservoir."

7. "The risk of waste associated with conducting only primary recovery operations far exceeds the risk of waste associated with enhanced recovery operations."

In its conclusions of law, the commission determined that further primary production would cause waste as that term is defined in subsections (B) and (D) of § 30–5–101(a)(i), W.S.1977. Under subsection (B) waste is

"[t]he inefficient, excessive or improper use, or the unnecessary dissipation of, reservoir energy";

and under subsection (D) it is

"[t]he * * * producing of any oil or gas well in a manner that causes * * * reduction in the quantity of oil or gas ultimately recoverable from a pool under prudent and proper operations * * *."

The commission ordered that production in the Buck Draw North Field Area be shut-in pending unitization for enhanced recovery. The majority interest owners filed a petition for review in the district court, and the matter was certified to this court.

### Evidence in the Record

Petitioners, the majority interest owners, claim that they were denied the right to effective cross-examination because the commission considered three documents which petitioners never had a chance to rebut. The documents consist of a Kerr-McGee economic analysis which was attached to Kerr-McGee's written closing argument, a letter from the BLM submitted to the commission on September 30, 1985, and a letter from an LL & E engineer

received by the commission on September 25, 1985. Attached to the letter from LL & E was a memorandum "summarizing the effect of delayed water injection (injection below the bubble point pressure) on the Buck Draw field * * *."

Petitioners' argument is sound with respect to the law of contested case procedure. Section 16–3–108, W.S.1977, guarantees a party the right to confront written testimony given by the other side. Subsections (a) and (c) of § 16–3–108, W.S.1977, state in pertinent part:

"(a) Subject to these requirements and agency rule if the interests of the parties will not be prejudiced substantially testimony may be received in written form subject to the right of cross-examination as provided in subsection (c) of this section.

\*　　\*　　\*　　\*　　\*　　\*

"(c) A party may conduct cross-examinations required for a full and true disclosure of the facts and a party is entitled to confront all opposing witnesses."

The denial of the right of cross-examination constitutes reversible error under § 16–3–114(c), W.S.1977, which provides in part:

"The reviewing court shall:

\*　　\*　　\*　　\*　　\*　　\*

"(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

\*　　\*　　\*　　\*　　\*　　\*

"(D) Without observance of procedure required by law." See also *Wyoming Bancorporation v. Bonham*, Wyo., 527 P.2d 432, 437 n. 6 (1974).

■ The problem with petitioners' argument is factual rather than legal. They make the following assertions of fact in their brief:

"The Majority Working Interest Owners first became aware of the BLM recommendations when the Order was distributed on October 10, 1985.

"The Commission also received, considered and relied upon extra record testimony submitted by Kerr-McGee in its 'Closing Statement' * * *. Extensive technical information was also submitted by LL & E after the close of evidence. * * * The Majority Working Interest Owners were unaware of this data until after the record was filed in this Court."

But none of these "facts" are supported by evidence in the record. First, there is nothing in the record which indicates that the commission closed the administrative record prior to its decision. If anything, Acting Chairman Glass indicated at the August 13th hearing that the record would remain open throughout the decision period. He stated that the commission would accept written comments on a report prepared by Bergeson up until the date of the decision. Because there is no indication that the record was closed, we cannot treat the three documents as extra-record material.

█ Second, nothing in the record establishes that petitioners did not see the three documents in time to rebut them. The commission stamped the letters from the BLM and LL & E when it received them. The stamp indicates that the letters were received several weeks before the commission announced its decision on October 10, 1985. The Kerr-McGee closing argument is not stamped. We do not know when it was received, but it is entirely possible that petitioners received all three of these documents, or knew of their submission, in time to rebut them. We cannot conclude that these documents were unknown to petitioners just because they make that bald assertion in their brief. Statements in briefs are not evidence that can be considered by a reviewing court. *Kirby Building Systems, Inc. v. Independence Partnership No. One, Wyo.*, 634 P.2d 342, 345 n. 2 (1981).

Petitioners could have employed the procedure outlined in Rule 12.08, W.R.A.P., to create a record supporting their contention. Rule 12.08 states in part:

"If, before the date set for hearing [conducted by the district court on review], application is made to the court for leave to present additional evidence, and it is shown to the satisfaction of the court that the additional evidence is material, and there was good reason for failure to present it in the proceeding before the agency, the court in contested cases shall order that the additional evidence be taken before the agency upon conditions determined by the court. The agency may adhere to or modify its findings and decision after receiving such additional evidence, and shall supplement the record to reflect the proceedings had and the decision made. Supplemental evidence may be taken by the court in cases involving fraud or involving misconduct of some person engaged in the administration of the law affecting the decision."

In their petition for review to the district court, petitioners alleged that

"[t]he WOGCC [commission] relied upon materials outside of the record, including but not limited to a recommendation of the Bureau of Land Management, which materials the Petitioners were not allowed to cross examine or counter in violation of Wyoming Statute § 16–3–107(r) and W.S. § 16–3–108(c)."

At that point in the proceedings they could have applied to the district court, under Rule 12.08, supra, for leave to present additional evidence on this issue. If they showed the district court that they had a good reason for failing to complain to the agency about these alleged extra-record documents, then the court would have remanded them to the agency to establish the record. See *Matter of State Bank Charter Application of Security Bank, Buffalo, Wyo.*, 606 P.2d 296, 301 (1980). But none of this was done, and consequently the record before us does not support petitioners' claim of error.

If petitioners had made a successful application under Rule 12.08, W.R.A.P., it might have been difficult for the commission to establish a record to reflect how the supplemental evidence was received and

made available to all parties. The commission states in its brief that

"it is quite clear that all parties at the hearing in August 1985, were aware of everyone's opportunity to submit additional data, evidence, comments, and argument and no one objected to the procedure. Many parties both for and against unitization, including the Petitioners, submitted such material. The Commission's files and records of this matter were open to all for their perusal."

But the record does not support all of these assertions. Some of the material in the record that was presumably submitted after the August 13th hearing was never stamped to indicate that the commission received it. And the record does not indicate that all of the additional data was available for the parties' perusal. These elementary facts should be noted in the record as each document is accepted by the commission.

Another problem with the commission's action was its failure to settle on a specific procedure and stay with it. The commission's order of August 16th indicated that it would accept only four additional studies which were on the verge of completion. The studies were to be exchanged by the parties in early September, but the order did not indicate whether the parties would then be permitted to comment on the contents of those studies. The parties all assumed that they could submit responses to the studies. Before long the record was cluttered with responses to the responses. Because the commission did not set a date to close the record, it was almost inevitable that one side would get in the last word and the other side would claim that it was unable to properly confront the evidence.

■ An agency can take documentary evidence in a contested case after the hearing, but it should make clear in its order how many levels of response and counter-response it will permit. As we noted above, a party is entitled to at least one response to any new evidence submitted. After the supplemental evidence and responses are in the record, the agency

should close the record on a predetermined date and return any evidence which is submitted contrary to the settled procedure. If this process is followed, the record will clearly show the reviewing court that there are no procedural errors. There will be no need to collect additional evidence under Rule 12.08, W.R.A.P., and the reviewing court and parties can concentrate on the merits.

Although the procedure used by the commission in this instance was less than desirable, petitioners did not establish a record from which we can conclude that there was no opportunity to confront or cross-examine the evidence submitted. The burden was on petitioners, and having failed to carry that burden, there is no basis for reversal.

### Waste

Petitioners concede that the commission has the power to shut-in producing wells to prevent the waste of oil and gas. *Inexco Oil Company v. Oil and Gas Conservation Commission, Wyo.,* 490 P.2d 1065 (1971); §§ 30–5–102(a) and (b), 30–5–104(b), 30–5–117, W.S.1977, and May 1985 Cum. Supp. But they contend that the commission's finding of waste suffers from two fatal flaws. First, they claim that before the commission could conclude that primary production would be wasteful, it had to make a finding, in the record, that secondary operations would be economically feasible. According to appellants, the commission did not include this finding in the record. Second, even if the finding had been included, appellants claim that it was not supported by substantial evidence.

### The Feasibility Finding

An agency's action must be set aside if the agency does not support it with sufficient factual findings in the record. Section 16–3–110, W.S.1977, states:

"A final decision or order adverse to a party in a contested case shall be in writing or dictated into the record. The final decision shall include findings of fact and conclusions of law separately stated. *Findings of fact if set forth in*

*statutory language, shall be accompanied by a concise and explicit statement of the underlying acts supporting the findings."* (Emphasis added.)

"This Court has held that this statute imposes a duty on the agency to make findings of basic facts upon which its ultimate findings of fact or conclusions are based, without which there can be no basis for appeal." *Big Piney Oil & Gas Company v. Wyoming Oil and Gas Conservation Commission, Wyo.,* 715 P.2d 557, 561 (1986).

The commission and the petitioners agree that economic feasibility is a basic fact which must be found before an ultimate finding of waste can be made under § 30–5–101(a)(i)(D), W.S.1977. That statute defines waste as:

"The locating, drilling, equipping, operating or producing of any oil or gas well in a manner that causes, or tends to cause, reduction in the quantity of oil or gas *ultimately recoverable from a pool under prudent and proper operations* * * *.*"[7]

In its brief, the commission correctly states that

"it would not be 'prudent and proper operations' to conduct secondary recovery if secondary recovery was not feasible, or if the value of increased recovery exceeded the cost of incremental production." See *LeBar v. Haynie,* Wyo., 552 P.2d 1107, 1111 (1976).

■ But the commission claims that the necessary finding of feasibility was included in its order. In finding number 8 the commission stated:

"The economics and feasibility of waterflooding or gasflooding are highly dependent on the timing of such operations. The proponents do not agree among themselves as to which method is better. The Commission must take economics into consideration; however, the Commission will not be placed in the position of determining what type of enhanced recovery should be initiated nor when."

This finding immediately followed the commission's finding that 13,400,000 barrels of additional oil would be recovered by a miscible gas flood and 7,000,000 barrels by a water flood. When finding number 8 is taken in context, it clearly implies that the commission found both recovery operations to be economically feasible. The commission simply left it up to the owners to decide which of the two feasible methods they should adopt. We hold that the commission's feasibility finding complied with the requirements of § 16–3–110, W.S.1977.

*Substantial Evidence*

Petitioners correctly point out that an agency's action is arbitrary and capricious and must be reversed if any essential finding is not supported by substantial evidence. *Holding's Little America v. Board of County Commissioners of Laramie County, Wyo.,* 670 P.2d 699, 703 (1983); § 16–3–114(c)(ii)(A), W.S.1977. Substantial evidence is

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. * * * Such evidence may be less than the weight of the evidence but cannot be contrary to the overwhelming weight of the evidence." *Big Piney,* supra, 715 P.2d at 561–562 (citing *Mountain Fuel Supply Company v. Public Service Commission of Wyoming,* Wyo., 662 P.2d 878 (1983)).

"We do examine the entire record before the administrative agency in arriving at a determination as to whether substantial evidence is present." *Western Radio Communications, Inc. v. Two-Way Radio Service, Inc.,* Wyo., 718 P.2d 15, 20 (1986). See also *Gilmore v. Oil & Gas Conservation Commission,* Wyo., 642 P.2d 773, 776 (1982).

"If there is substantial evidence to support a finding, * * * the ultimate weight to be given that evidence is to be determined by the agency in light of its expertise and the experience of its members in such matters. * * * If the agency's decision is found to be supported by sub-

---

7. The commission also found waste under subsection (B) of § 30–5–101(a)(i), W.S.1977, but we will not discuss that alternative definition because we hold that the commission's finding of waste under subsection (D) was correct.

stantial evidence, we cannot substitute our judgment for that of the agency, but we are required to uphold its findings upon appeal." *Big Piney, supra,* 715 P.2d at 562.

Petitioners argue that the commission's finding that secondary operations would be feasible is unsupported by substantial evidence. We disagree. Mr. Chebul and Mr. Kimes both testified that the after-tax, rate of return on secondary operations would range from 16 to 40 percent. These estimates were supported by exhibits and detailed computer models submitted to the commission at the August 13th hearing and the September 6th data exchange. Moreover, the exhibits and computer model runs submitted by Kerr-McGee and LL & E were based on data from the entire oil and gas field. This was not true of the economic estimates of the petitioners which were extrapolated from data from only part of the field. We can well understand why the commission placed substantial weight on the Kerr-McGee and LL & E feasibility studies. Its feasibility finding was supported by substantial evidence.

### Forced Unitization

Petitioners argue that the commission exceeded its powers when it ordered them to shut-in their wells "pending unitization for enhanced recovery." They claim that the commission forced them into a unit in violation of § 30–5–110(f), W.S.1977, which states:

"No order of the commission authorizing the commencement of unit operations shall become effective until the plan of unitization has been signed or in writing ratified or approved by those persons who own at least eighty percent (80%) of the unit production or proceeds thereof that will be credited to royalty and overriding royalty interests which are free of costs, and unless both the plan of unitization and the operating plan, if any, have been signed, or in writing approved or ratified, by those persons who will be required to pay at least eighty percent (80%) of the cost of unit operations."

In reality, none of the interest owners have been forced into a unit. The commis-

sion's order gives the owners a choice of voluntarily forming a unit or ceasing their wasteful production. If the commission could not force this choice on the appellants, then it would be prevented from exercising its primary function, the prevention of waste.

"The commission has authority and it is its duty to make investigations to determine whether waste exists or is imminent, or whether other facts exist, which justify or require action by it hereunder." Section 30–5–104(b), W.S.1977, May 1985 Cum.Supp.

When the commission decides that waste is imminent, it has the authority, under § 30–5–104(d)(ii)(A), W.S.1977, May 1985 Cum.Supp.,

"[t]o regulate, for conservation purposes:
"(A) The drilling, producing, and plugging of wells."

When the legislature passed the waste prevention statutes, it apparently understood that producers would sometimes use wasteful methods out of ignorance or self-interest. That is why the commission was given the power to order a halt to such practices. If, under the facts of a given case, the commission must choose between a producer's economic well-being and the prevention of waste, it must choose the latter. See *Larsen v. Oil and Gas Conservation Commission,* Wyo., 569 P.2d 87, 93 & n. 4 (1977). Under extreme circumstances, the commission's decision might drive a producer out of business.

██ In the case at bar, the commission's duty to prevent waste has forced it to issue an order that is unpalatable to the majority of the interest owners. They must either shut-in their wells, which might drive some of them out of business, or they can unitize for secondary operations. It may be unpalatable, but it is a legitimate choice. If, as a practical matter, the commission's order causes the parties to unitize, then that result can be attributed to the commission's overriding duty to prevent waste rather than an improper decision to force these parties to unitize.

Affirmed.